Richard F. CLEVELAND and Jessie B. Cleveland, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8278.

United States Court of Appeals
Fourth Circuit.

Argued March 30, 1961.

Decided Dec. 7, 1961.

George D. Hubbard, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on the brief), for petitioners.

Richard J. Heiman, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is an appeal from a determination by the Tax Court of deficiencies in the taxpayer's federal income tax for the years 1955 and 1956. Richard F. Cleveland and Jessie B. Cleveland, husband and wife, of Baltimore, Maryland, filed joint returns for the years involved, using a cash method of accounting. Mrs. Cleveland had no connection with the activities herein considered but, because of the joint returns, she is a party hereto. References to taxpayer pertain to Richard F. Cleveland only.

Taxpayer claimed deductions under Internal Revenue Code of 1954, Section 174(a) (1), 26 U.S.C.A. § 174(a) (1), which provides that taxpayer may treat expenditures for research and experimentation which are paid or incurred by him during the taxable year *in connection with his trade or business* as expenses which are not chargeable to capital account and that expenditures which are so treated shall be allowed as a deduction. Taxpayer made the necessary election under the statute to treat certain expenditures as expenses but the Com-

missioner determined, and the Tax Court upheld that determination, that the expenditures in question were not made by Cleveland in connection with his trade or business.

It was found by the Tax Court that for many years Cleveland has been an attorney and an active practitioner, which is his primary occupation and business. In 1931 taxpayer met a German immigrant, Hans Kerla, an inventor and chemist, who was seeking legal advice. The legal matter involved in the initial contact was soon settled but Cleveland became interested in Kerla and his experiments and began helping him financially because Kerla lacked funds to support his family and carry on his work. Kerla had developed an inorganic liquid binding material, later named "Kerloid," and he was seeking methods to promote and perfect commercial uses thereof. In 1946 Cleveland purchased a house in his own name wherein Kerla maintained, rent free, a home for his family and set up his laboratory in the large basement.[1] Kerla died in September 1957.

During 1955 and 1956 and for a number of years prior thereto, Kerla devoted his full time to development of Kerloid. Shortly after their first meeting, Cleveland began providing Kerla with funds for support of his family and for materials and equipment to enable him to carry on his work. Cleveland became interested in the commercial potentialities of the binder. By at least 1945 the two men, according to Cleveland, had agreed orally that they had equal interests in the binder enterprise. At sometime in 1955, Cleveland learned of the enactment of Section 174 and decided at that time to enter into a written agreement with Kerla regarding their business affairs.[2]

No written agreement was made, however, until April 1956 when a "trust" document was executed, retroactive to December 31, 1954. The agreement although set forth in full in the Tax Court's opinion, 34 T.C. 517, No. 52 (1960), is reproduced below.[3] Admitted-

1. The laboratory facilities of Johns Hopkins University were made available to Kerla through his association with members of the University faculty.

2. The Tax Court found that Cleveland learned of the enactment of § 174 sometime in 1954 but Cleveland himself testified that it was obviously sometime in 1955 although he could not state the exact time. The following questions and taxpayer's answers are pertinent to the present inquiry:

"Q. Prior to the execution of the agreement, did you ever at any time believe the money you advanced to Mr. Kerla was a loan? A. I believe in the early days if I had thought of it I would have so regarded it. Again, I can't say at what point—and Mr. Kerla said I was a part owner—when that concept came in in place of the loan concept.

"Q. Would you state for me as an individual what trade or business that you believe you are engaged in? A. In this context? Of course, primarily I am a lawyer. (Interruption.) I was certainly engaged with Mr. Kerla in trying to promote commercially his process for his benefit and mine.

"Q. Your trade or business was only to promote a patent? Is that correct?

A. Well, to develop it and do everything that was necessary to bring it to a profitable basis.

"Q. How long have you considered yourself in this trade or business? A. Mr. Seidman, as you are well aware, *I didn't think in those technical terms until this case arose under Section 174.* But certainly, again, the best I can tell you is that at least 10 years and probably 15 years before 1955." (Emphasis supplied.)

3. "Trust Agreement entered into as of December 31, 1954, by and between Hans Kerla and Richard F. Cleveland, both of Baltimore, Maryland.

"Kerla has, over a period of many years, invented, and developed uses for a liquid binder, referred to as 'Kerloid.' Patent applications have been filed by him covering some aspects of the binder and its uses and products, but it is contemplated that he will file other applications relating thereto from time to time. Cleveland has, over a period of years to the date of this Agreement, advanced to Kerla in excess of $68,700, which has been used for experimental work on the binder and for Kerla's personal expenses. The word invention, as used herein covers all present and future patents and

ly, the primary purpose of the written agreement was to record the tenor of their mutual understanding for purposes of Internal Revenue Code of 1954, Section 174(a) (1). Cleveland testified that he had not wanted to put anything in writing earlier for fear that he and Kerla might thereby impose some restriction upon their commercial activities which could later prove to be undesirable. According to Cleveland, the trust document was decided upon because it was flexible enough to describe their relationship which he claimed had developed into a rather standard course of conduct over a number of years and, further, to avoid certain technical problems involved in patent law.

Kerla had no business experience and suffered language difficulties in business negotiations because of his German sentence structure and a heavy accent. Cleveland testified that his part in the enterprise, other than providing funds for the operations, was to act as a business advisor and to make contacts in the business world which might result in developing commercial uses and applications of Kerloid; that he and Kerla held regular weekly conferences to discuss the patent applications, and developments of the binder and its uses in any form.

"In consideration of the premises and other good and sufficient consideration, it is hereby agreed:

"1) In consideration of such advances made by Cleveland to December 31, 1954, Kerla hereby agrees that he holds the invention in trust, one-half for himself, and one-half for Cleveland, their personal representatives, legal successors and assigns.

"2) In the event that said invention is assigned to any other person or persons, or if licenses are granted to the invention, Kerla and Cleveland will share equally in the consideration or avails as between themselves, notwithstanding others who have contributed or may contribute to the commercial success of the binder may also share therein in such amount and form as Kerla and Cleveland may agree.

"3) This Agreement is subject to any commitments heretofore or hereafter made to others as to their participation, it being the intention of this Agreement to establish the equal participation of Kerla and Cleveland as between themselves in the avails of the invention.

"4) Cleveland hereby confirms that he has annually released Kerla from any and all claims with respect to money advanced to or for Kerla in each respective year prior to January 1, 1955, whether for expenses of development of the invention or for personal expenses of Kerla.

"5) Kerla agrees to continue to spend his full time in active experimentation on the invention. Until such time as other arrangements are made, Cleveland agrees to continue to advance from and after January 1, 1955, the expenses of experimentation and personal expenses of Kerla to the extent of Cleveland's reasonable financial ability to do so, and Kerla shall not be under any obligation to repay such experimental expenses, and shall be obligated to repay advances for personal expenses dating from January 1, 1955, only if fully able to do so.

"6) Kerla agrees to keep accurate annual records of advances made by Cleveland beginning with January 1, 1955, and a detailed annual account of expenditures for experimentation, and to submit such records and account to Cleveland on or before February 1 of the succeeding year.

"7) Nothing contained herein shall qualify Kerla's right to the legal title to the invention, or his right to prosecute pending patent applications or to file other such applications in his name as sole inventor.

"8) The parties agree that in addition to the advances referred to above, Cleveland has rendered substantial legal services over a period of many years in the development of the invention for which no payment has been made, and that in the event that the invention is financially successful, a reasonable fee for such services will be paid to Semmes, Bowen & Semmes, of which Cleveland is a partner, which will be charged in the same proportion as the avails are divided.

"9) It is agreed that the advances by Cleveland referred to above do not include the cost and expenses paid by Cleveland to purchase in his name the house at 525 Beaumont Avenue, in Baltimore, which Kerla has for several years prior to the date of this Agreement occupied as his residence and office without rent.

"10) The parties agree to execute such other papers as may be requisite to implement any of the foregoing.

"Witness the hands and seals of the parties, as of December 31, 1954."

(Signatures affixed.)

progress of the work; at these conferences payments by check were made to Kerla. The Tax Court found that the legal services rendered by Cleveland to Kerla consisted largely of advice relative to the form of transactions or proposed transactions involving the transfer to users or prospective users of right in Kerla's binder, the negotiations leading to such transfers and the preparation of necessary legal documents. Other services rendered by Cleveland to Kerla consisted largely of making him acquainted with those persons known to Cleveland who were or might be engaged in such fields of endeavor as would provide the necessary outlets for Kerla's binder. This state of the business relationship between the two men, it was found, continued virtually unchanged until Kerla's death.

On his 1955 tax return, Cleveland claimed a deduction of $5,598.42 for research and experimental expenses; a similar deduction of $3,342.83 was claimed in 1956. Cleveland and the Commissioner have agreed, however, that amounts actually expended by Kerla for such purposes were $4,923.07 in 1955 and $3,234.86 in 1956. (No deduction is claimed for those advances used by Kerla for his personal living expenses.)

It is Cleveland's contention that he and Kerla had been engaged in a joint venture to develop Kerloid for commercial use since at least 1945, some ten years prior to the first tax year here involved, and continuing until Kerla's death in 1957; if there was a joint venture in which both men were active participants, the actual expenditures by Kerla for research and experimentation could be deducted by Cleveland since they were incurred in connection with his trade or business.

Cleveland was the only witness before the Tax Court and his testimony, together with the written agreement, provided virtually the only evidence considered by the court. The Tax Court made the broad but positive finding of fact as follows: "Petitioner made no expenditures during the years at issue for experimental or developmental purposes with respect to the binder invention." In its rather incomplete opinion, the court stated that: It was clear from taxpayer's testimony that he made the advances as mere loans; he furnished such funds to Kerla without thought of any benefit to himself, perhaps indulging in the mere hope of eventual return thereof; from the funds advanced, Kerla, not Cleveland, made the expenditures for experimental and developmental purposes; the only reason for the execution of the written agreement was the advent of Section 174; the agreement, in prospective effect, constituted no more than a sale by Kerla to taxpayer of a one-half ownership in the binder invention in consideration of moneys previously advanced; the agreement created neither a partnership nor a joint venture; it made no provision for sharing expenses and liabilities incurred in developing and commercializing the binder; the agreement merely converted earlier loans by taxpayer to the purchase price paid by him for a one-half interest in Kerla's invention and released Kerla from all liability for repayment of such advanced funds. Directing attention to the fact that taxpayer is an attorney with long experience and high standing in his profession, the court said: "Should he have intended to establish a partnership or joint venture relationship with Kerla, it is reasonable to expect that their agreement would clearly express such an intention."

■ Whether the parties actually intended to become partners (or joint venturers) has long been treated as a question of fact and a finding as to such intention, if supported by competent evidence, is final. However, it is otherwise, the Supreme Court indicates, if the Tax Court erroneously disregards or improperly applies legal principles. See Commissioner v. Tower, 327 U.S. 280, 287, 66 S.Ct. 532, 90 L.Ed. 670 (1946); see also Culbertson v. Commissioner, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659.

We experience no difficulty in agreeing with the determination of the Tax Court that the advancements by Cleveland to

Kerla prior to the execution of the written agreement were in the nature of loans. Cleveland acknowledged that if he had considered the matter, he would have so regarded them. He exhibited no interest in the amounts expended by Kerla for experimental and developmental purposes from the total advancements. He admitted that "there was nothing enforceable" between him and Kerla. His testimony was quite vague and indefinite as to any change in his relationship with Kerla prior to the execution of the written agreement or as to the time when the advancements were no longer loans but were made strictly at the risk of the venture with the expectation of profiting therefrom. The finding of the Tax Court as to the relationship existing between Cleveland and Kerla, and the nature of the advancements prior to the execution of the written agreement, are not clearly erroneous and must be accepted as binding on this court.

■ But we cannot agree with the Tax Court's interpretation and construction of the written agreement of April 20, 1956, and the finding that no changes in the relationship of the parties were effected thereby. In Thomas v. Commissioner of Internal Revenue, 254 F.2d 233, 236 (5th Cir.1958), it was held that if the conclusion of the trial court as to the ultimate fact is merely " * * * a product of legal reasoning, that conclusion is subject to appellate review free from the restraint of the clearly erroneous rule." So here, this court should be free from the impact of the clearly erroneous rule where the ultimate conclusion as to the intent of the parties is to be drawn from an analysis, interpretation and construction of what appears, on its face, to be a legally binding written agreement.

The Tax Court stated: "It seems clear indeed that so far as petitioner was concerned, the only reason for the execution of a written agreement was the advent of Section 174." But there is no finding that the written agreement was a sham or that the parties did not intend to be bound thereby. Cleveland frankly admitted that he decided to enter into an agreement in writing to clearly define his relationship with Kerla after he learned of the enactment of Section 174. But this fact in itself does not render the agreement bogus or a sham. At most, the existence of a tax avoidance motive is something which may be considered along with other facts and circumstances in determining intent. In this instance the decision of the parties to the agreement to define their relationship so as to take advantage of the benefits of the statute was in harmony with the purpose of the enactment to encourage expenditure for research and experimentation.

The Tax Court treats the "loans" by Cleveland prior to April 20, 1956, as the purchase price for a one-half interest in the invention. It is uncontroverted that money was being expended in experimental, developmental and promotional work. The written agreement clearly provides that Kerla shall devote "his full time in active experimentation on the invention." Cleveland agreed to advance the expenses of experimentation insofar as financially able to do so.[4] Kerla agreed to keep accurate records for the expenditure of funds so advanced and to furnish Cleveland with a report by February 1 of each year. Each of the parties was to participate in the enterprise, Kerla giving his time and effort and Cleveland providing the necessary funds, and they were to share equally in the avails thereof. Though neither the word "partnership" nor the words "joint venture" appear in the agreement in characterizing and defining the relationship of the parties, the effect of the contractual provisions, considered as a whole, is to make the parties equal participants in a joint venture. To that extent, Cleveland was thereafter engaging with Kerla in the trade or business of promoting the commercial development of the invention in which Cleveland was

4. The funds were advanced until Kerla's death and, hence, there is apparently no question as to Cleveland's financial ability to make the payments.

the owner of a participating one-half interest.

Since we cannot say that the Tax Court was clearly erroneous in determining that the advancements to Kerla prior to April 20, 1956, were loans from which Kerla expended certain sums for experimental purposes, we affirm the decision insofar as the claimed deductions under Section 174 prior to the date of the *execution* of the written agreement were disallowed. However, we conclude that on and after April 20, 1956, the relationship between Cleveland and Kerla became that of participants or venturers in a joint enterprise. Deduction of expenditures for purposes of experimentation and development made by Cleveland on and after April 20, 1956, should be allowed.

The decision of the Tax Court is affirmed in part, reversed in part and remanded for further proceedings consistent with the views herein expressed.

Affirmed in part; reversed in part and remanded.