BURTON L. SPELLMAN and ROSLYN SPELLMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spellman v. Commissioner
Docket No. 24826-84.
United States Tax Court
T.C. Memo 1986-403; 1986 Tax Ct. Memo LEXIS 202; 52 T.C.M. (CCH) 298; T.C.M. (RIA) 86403; August 27, 1986. Allen B. Glass, for the petitioners. J. Anthony Hoefer, for the respondent. KORNER
MEMORANDUM OPINION KORNER, Judge: This matter is before the Court on respondent's motion for partial summary judgment pursuant to the provisions of Rule 121. [1] The issue raised by the motion is whether Elmer South Oil Partnership, Ltd., an Oklahoma limited partnership, is entitled to a deduction for research and experimental expenditures *203 under section 174. [2]
Respondent determined a deficiency in Federal income tax against petitioners in the amount of $3,913 for their taxable year ended December 31, 1980. Burton L. Spellmand ("Burton" or "petitioner") and Roslyn Spellman ("Roslyn") were husband and wife and residents of Morton Grove, Illinois, at the time the petition herein was filed. Burton and Roslyn (hereinafter referred to, collectively, as "petitioners") filed a joint Federal income tax return for their taxable year 1980, using the cash receipts and disbursements method of accounting. During the year in issue Burton was an executive and Roslyn was a housewife. Elmer South Oil Partnership, Ltd. ("Elmer South") was organized as a limited partnership under the Oklahoma Uniform Limited Partnership Act on July 25, 1980. Elmer South's general partner was T.X. Investment Corp.; its limited partner was Charles Kaplan. Sometime prior to December 22, 1980, and pursuant to the provisions of an amended *204 partnership agreement, Elmer South was reorganized and expanded for the stated purposes of: (1) Investing in certain oil and gas drilling and development ventures; and (2) investing as a limited partner in Sci-Med, an Israeli limited partnership to be formed for the purposes of engaging in the research, development, and exploitation of beta-lactam antibiotics, [3] and entering into a licensing agreement for purposes of marketing and distributing the beta-lactam antibiotics "if developed." Elmer South was to exist until January 2, 2010, unless extended or earlier terminated as provided in the amended limited partnership agreement. Yuki, Inc. ("Yuki") became the general partner of Elmer South in the reorganization.Yuki was an Oklahoma corporation organized to serve as the general partner of Elmer South. The stockholders of Yuki were Zalmon Horn and Alex J. Pinsky. Yuki had no prior experience in the development and drilling of oil or in the acqusition of inventions and the exploitation of technology. Prior to the formation of Yuki, Horn and Pinsky had structured offerings of investments in real estate, and of research and *205 development and oil and gas ventures. They had substantial experience in the review and analysis of tax sheltered investments. Yuki was required, as general partner, to contribute $1,000 to the capital of Elmer South, in exchange for which it would receive a 1 percent interest in the partnership. The amended partnership agreement provided that the general partner was to have the sole and exclusive power to manage and control all aspects of Elmer South's business affairs.In consideration for its services as general partner, Yuki was to receive management fees, organization costs, and additional management fees. The amended partnership agreement further provided that Elmer South was to have 35 limited partners. The limited partners were not to take part in any aspect of the management or to transact any business of the partnership. They were to have no power to sign for or to act for the partnership. Each limited partner was to irrevocably appoint the general partner as his true and lawful attorney and agent for purposes of executing, acknowledging, swearing to, and filing all documents which the general partner determined to be necessary to discharge the purposes of the partnership.
*206 Annual next profits or losses from the investment in Sci-Med, tax credits, and nonliquidating distributions were to be allocated 99 percent to the limited partners of Elmer South, and 1 percent to Yuki as general partner. In December 1980, Yuki offered 35 limited partnership units in Elmer South to prospective investors at a price of $16,500 each, payable in three installments as follows: (1) $11,000 upon execution of the subscription agreement; and (2) a promissory, "subscription" note in the principal amount of $5,500 payable in two interest-free installments of $2,750 each on or before November 1, 1981, and November 1, 1982. Each limited partnership unit represented an interest of 2.85714 percent. Elmer South and Ikapharm, an Israeli corporation, entered into a partnership agreement dated December 16, 1980, pursuant to the terms of which they formed Sci-Med, and Israeli limited partnership, for the purpose of engaging in the research, development, manufacture, and marketing of new beta-lactames. Ikapharm, Israel's second largest pharmaceutical manufacturer, was Sci-Med's general partner. Elmer South was Sci-Med's limited partner. As general partner of Sci-Med, Ikapharm was *207 granted the exclusive right to manage and control the partnership's business. Ikapharm was obligated, inter alia, to see to the diligent fulfillment of a sub-research and development agreement to be entered into by Sci-Med and Teva Pharmaceutical Industries, Ltd. ("Teva"), Israel's largest pharmaceutical group and the parent of Ikapharm, with Teva as the active party under the contract. As the limited partner, Elmer South was not to participate in the management or to transact any business of Sci-Med. Elmer South could not act for or bind Sci-Med. Ikapharm contributed $1 to the capital of Sci-Med. Elmer South was to contribute to Sci-Med amounts not to exceed $855,000; Contributions, however, were not to exceed $50,000 for 1981 and $42,500 for 1982. All items of income, deduction, net gain, or loss from the Sci-Med partnership were to be allocated to Elmer South, except for 1 percent of the gross royalty income, not to exceed $10,000, which was to be allocated to Ikapharm. The fiscal year of Sci-Med was a calendar year and its books and records were to be kept using the accrual method of accounting. Sci-Med was to exist for a period of 95 years from December 16, 1980, unless *208 earlier terminated as provided in the partnership agreement. On or after December 16, 1980, Teva entered into an agreement with the government of Israel, pursuant to the terms of which Teva was to conduct research and development for the general purpose of developing new antibiotic drugs, including the synthesis of new drugs as well as the extension of any drugs currently in existence. With respect to the research, Teva was to report directly to the Israeli government. The government of Israel, through its Industrial Development Bank ("IDB"), was to loan an amount equal to 50 percent of the research expenses, estimated by Teva to be $855,000, to the limited partners of Elmer South, through Teva. The research was to be carried out within 36 months of the approval of the loan. The research was to be monitored by the Israeli government through a variety of interim financial reports, including reports at the end of the 36-month research period. Teva had 7 years, unless extended, within which to exploit any products developed under the research and development agreement. Rights to any products not exploited by Teva were to be transferred to the Israeli government. Should the Israeli *209 government undertake to exploit any such products, the proceeds therefrom were to be applied: (a) To repay the loan from the government of Israel to the limited partners of Elmer South; and (b) any remaining amounts were to be divided equally between Teva and the Israeli government. On December 16, 1980, Sci-Med and Teva entered into a sub-research and development agreement pursuant to the terms of which Teva agreed to undertake a research and development program in the general area of development of new antibiotic drugs, including "the synthesis of new drugs as well as the extension of any drugs currently in existence." The specific research area was the rational extension of beta-lactam antibiotics, a concept having as one of its originators an independent consultant to Teva. Teva's research was to address the therapeutic problem presented by the effect of stronger beta-lactam antibiotics -- necessary because of the evolution of various mutant strains of bacteria resistant to known beta-lactam antibiotics -- on portions of the body unrelated to the bacteria which they were meant to attack. Since it has been proved that penicillin in some way interferes with the enzymes that act *210 to complete the wall of the bacterial cell, Teva intended, by the rational extension of the beta-lactam antibiotics, to create an antibiotic more resistant to detoxification by the bacteria. The research was to include, but was not limited to, the various steps necessary to develop a natural, semi-synthetic, or synthetic molecule that would interfere or in some other way act to control or affect the catalytic or regulatory process with respect to the completion of the bacterial cell wall. Teva irrevocably assigned, conveyed, and transferred all of its right, title, and interest in and under the research and development agreement with the Israeli government and to any program payments to Sci-Med. During the term of the sub-research and development agreement, Teva was to perform the required services in an effort to develop products [4] to be sold in commercial quantities for both medical and nonmedical uses. The sub-research and development agreement also provided that, should the specific project prove not to be "economically justifiable, the Developer [Teva] and the General Partner [Yuki] of the U.S. Partnership [Elmer South] shall mutually agree to amend the R&D [research *211 and development] Program so as to substitute and undertake other specific projects * * *." Elmer South's interest in the substituted research project was to be in such proportion as Elmer South's remaining funds bore to the total sum required to complete such new research project. The sub-research and development agreement provided that, in consideration for its services, Teva was to receive a total of $855,000, payable as follows: $5,000 upon execution of the agreement; $14,000 within 14 days of the execution of the agreement; *212 and the balance within 14 days after the receipt of vouchers for expenses approved by the Israeli government. Not more than $50,000 were, however, to be paid in any calendar year. Sci-Med was to satisfy its obligation to Teva by paying $427,000 plus all of the proceeds, in shekels, [5] irrespective of dollar value, of the loan from the government of Israel. Contemporaneously with the execution of the sub-research and development agreement, Sci-Med and Teva entered into an exclusive license agreement dated December 16, 1980. The agreement provided that Teva wanted to obtain "the sole and exclusive license to make and manufacture [6] and to use, sell and otherwise distribute Products [7] throughout the world and in connection therewith to use the "Proprietary Information," [8] and granted Teva the exclusive license "to manufacture and make sales or other dispositions through the world of Products." Teva was further granted the right to sublicense the license, and "to use in its entirety the Proprietary Information." Sci-Med agreed to refrain from, directly or indirectly, manufacturing, selling, *213 or distributing products, under its own brand name or on behalf of others, which may reasonably be regarded by Teva as directly competitive with the products. Sci-Med was obligated to provide reasonable security measures to prevent unauthorized persons, including an affiliate of Sci-Med, from obtaining any information, notes, records, data, plans, designs, or other documents constituting proprietary information. Sci-Med further agreed not to divulge such knowledge and not to permit any of its affiliates to perform any function or job in connection with products or to have access to the proprietary information unless such person entered into a nondisclosure agreement containing restrictions similar to those applicable to Sci-Med. *214 Under the provisions of the exclusive license agreement, Teva was to pay to: (1) Sci-Med a royalty of 5 percent of the net sales and of the sublicensing fees until Sci-Med had recouped its research expenses. Thereafter, Teva was to pay Sci-Med a royalty of 1 percent of net sales and of the licensing fees; and (2) a special fund in care of the Office of the Chief Scientist ("OCS") of the Israeli government any commission which Sci-Med was or might be required to pay. [9] Teva was to institute and prosecute any patent-infringement or other suits necessary to protect Sci-Med's and Teva's respective rights, title, and interest in and to any patents and trade secrets or other confidential information included within the proprietary information. Teva was to permit access to the premises where the business pursuant to the exclusive license agreement was conducted to the authorized representative of "the General Partner of the Licensor" [Ikapharm] and/or of the OCS during normal business hours "for the purposes [sic] of monitoring the progress of such business." The term of the exclusive license agreement was to *215 expire 95 years after the date of receipt by Sci-Med of the first royalty payment, except that the agreement would automatically terminate if the government of Israel obtained Sci-Med's rights to patents on the inventions resulting from the research and development program. The agreement further provided for its early termination under the following circumstances: (1) Upon or after the filing by either Sci-Med or Teva of a petition in bankruptcy, reorganization, liquidation, or insolvency or upon an adjudication thereof; (2) upon assignment of all or any portion of the agreement or of the license granted therein by Teva in violation of its provisions; (3) upon any fundamental default or breach of the terms of the agreement by the other party not cured within 90 days of notice thereof. Upon expiration of the term of the agreement, or if earlier duly terminated by Teva, Teva was to become the owner of all the rights, title, and interest in and to the proprietary information. Teva was to have no further obligation under the exclusive license agreement other than: (1) To make payments of royalties and to supply statements relating thereto to Sci-Med; and (2) to make all commission payments *216 to which the OCS was entitled with respect to the sale or other disposition of products. [10]
Teva and Sci-Med executed an option agreement on December 16, 1980, pursuant to the terms of which Sci-Med granted Teva an irrevocable option "to purchase all of Licensor's [Sci-Med's] rights, title and interest in the 'Proprietary Information.'" [11] The option was exercisable at any time after June 30, 1982, by giving Sci-Med written notice of the intent to exercise the option accompanied by a nonrefundable downpayment of $2,000, and an additional $18,000 payable concurrently with the next $18,000 payable to Sci-Med with respect to net sales and license fees. The consideration to be paid by Teva for the exercise of the option was Teva's "understanding to honor all its warranties, representations, covenants and undertakings set forth in the Exclusive License Agreement (including but not limited to the payments described in Paragraph 5 of the Exclusive License Agreement)" for a period coterminous with the term of the exclusive license agreement. [12] Upon exercise of the option, Teva was to have all of the rights appertaining to the proprietary information, *217 including the right to apply for and register all related patents in its name. A handwritten addendum to the aforesaid agreements provided that, notwithstanding any provisions to the contrary contained in the agreements, the term of the exclusive license agreement and of the option agreement and of Sci-Med's life was to be the later of: (1) 24 years from December 16, 1980; or (2) 15 years from the date of commercial exploitation of the product. In no event, however, were the said terms to extend beyond the year 2019. The sub-research and development agreement, the exclusive license agreement, the option agreement, and the written addendum were executed by Dan Suesskind on behalf of both Sci-Med and Teva. Suesskind was an officer of both Teva and Ikapharm, Teva's subsidiary and Sci-Med's general partner. On December 31, 1980, petitioner subscribed to 50 percent of a limited partnership unit, representing a 1.42857 percent interest in Elmer South. Petitioner paid $5,500 in cash as *218 part of his required capital contribution. The promissory "subscription" note was in the principal amount of $2,750, payable in two interest-free installments of $1,375 each on November 1, 1981, and November 1, 1982. The assignment of production payment and agreement provided for the assignment of the said payments of Teva as collateral for the assumption indebtedness under the sub-research and development agreements. Pursuant to the assumption indebtedness, petitioner agreed to pay to Teva, upon receipt of 30-day written notice, 1.42857 percent of the unpaid portion of the amounts due to Teva under the subresearch and development agreement, but not to exceed $11,500. In 1981, the IDB and Elmer South, represented by its general partner Yuki, entered into a loan agreement under the terms of which IDB agreed to lend to Elmer South's limited partners, represented by Yuki, the aggregate principal amount of 720,320 Israeli shekels payable in installments or advances beginning 2 months from the date of commencement of the research and development project and thereafter as progress reports were submitted by the OCS. The aggregate of the advances was not to exceed the equivalent of $150,000. *219 The terms of the loan called for repayment of principal and interest, at an annual rate of 6 percent on the outstanding principal amount, payable in shekels or dollars at Yuki's discretion, 12 years from the first advance. Interest was not to accrue until the research and development program was completed as determined by the OCS. Yuki, as nominee of the limited partners of Elmer South, had the option of extending the term of the loan for an additional 12-year term by giving written notice to the IDB and to the government of Israel before the expiration of the original 12-year period. Elmer South's "net profit," as therein defined, from Sci-Med for the preceding calendar year was to be determined on each payment date and 25 percent thereof was to be applied towards reduction of the outstanding principal and interest on the loan. Elmer South reported an ordinary loss of $1,148,776 on its U.S. Partnership Return of Income, Form 1065, for its taxable year ended December 31, 1980. The said loss included a claimed deduction in the amount of $855,000 for research and experimental expenditures attributable to the Sci-Med venture. Elmer South's return was filed on a calendar year basis, *220 using the accrual method of accounting. Petitioners claimed a loss of $16,243, representing their distributive share of the losses claimed by Elmer South, on their Federal income tax return, Form 1040, for their taxable year ended December 31, 1980. In his notice of deficiency dated April 12, 1984, respondent adjusted the amount of the loss claimed by petitioners to reflect, inter alia, the disallowance of the research and development expenses in the amount of $855,000 claimed by Elmer South, on the grounds that petitioners had failed to establish: (a) That the amounts were paid or incurred; (b) that the amounts were paid or incurred for the purposes indicated; (c) that the amounts paid or incurred were ordinary and necessary business expenses; (d) that the amounts were not nondeductible preoperating and/or capital expenditures; (e) that the alleged transactions, expenditures, and events underlying the claimed deductions ever occurred in fact or substance; (f) that the alleged transactions, expenditures, and events underlying the claimed deductions served any business purpose or possessed any economic substance and, hence, were not mere shams for federal income tax purposes; *221 (g) that the alleged venture was entered into and carried on as a trade or business, or for the production and/or collection of income; (h) that the alleged venture was entered into and carried on for profit; (i) that any amount in excess of the cash you actually contributed under the terms of your subscription agreement should be includable in either the partnership's or your adjusted basis for the activity and/or its underlying assets; (j) that you were "at risk" under I.R.C. § 465 for any amounts in excess to the cash you actually contributed under the terms of your subscription agreement; (k) that any alleged contractual payment arrangement entered into by you has economic substance, represents a bona fide debt obligation, is not contingent and indefinite in nature, has a business purpose, does not cause a material distortion of income, and meets the "all events" test; and (1) Additionally, with regard to the research and development deduction, that the amount deducted was actually paid or incurred for new product research and development. Petitioners filed a petition with this Court on July 12, 1984. On October 28, 1985, respondent filed a motion for *222 partial summary judgment herein, together with documents supported by affidavit. Said motion was calendared for hearing at Chicago, Illinois, on November 12, 1985. On that date, respondent filed a memorandum brief in support of his motion for partial summary judgment. On December 30, 1985, petitioners filed a memorandum brief in opposition to respondent's motion for partial summary judgment, together with supporting affidavit and document. Respondent moved for leave to file a reply to petitioners' memorandum brief on January 21, 1986, which leave was granted on January 27, 1986. Respondent filed his reply brief on March 12, 1986. The case is before us in this position. Rule 121(b) provides that a decision may be rendered on a motion for summary judgment if it is shown "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. A partial summary adjudication may be made which does not dispose of all the issues in the case." Rule 121 is derived in large part from Rule 56 of the Federal Rules of Civil Procedure. See notes to the Court's *223 new rules of 1974, 60 T.C. 1057, 1126-1129. The party moving for summary judgment has the burden of proving that no genuine issue as to any material fact exists, and that he is entitled to judgment as a matter of law. Adickes v. Kress & Co.,398 U.S. 144, 157 (1970); Gulfstream Land and Development v. Commissioner,71 T.C. 587, 596 (1979). The factual materials presented and the inferences to be drawn from such materials must be viewed in the light most favorable to the party opposing the motion so that any doubt as to the existence of a genuine issue of material fact will be resolved in favor of denying the motion. Adickes v. Kress & Co.,398 U.S. at 157; Jacklin v. Commissioner,79 T.C. 340, 344 (1982). The motion must be granted if the Court is satisfied that no real factual controversy is present so that the remedy can serve its "salutary purpose in avoiding a useless, expensive and time consuming trial where there is no genuine material fact issue to be tried." Lyons v. Board of Education of Charleston,523 F.2d 340, 347 (8th Cir. 1975). Nevertheless, a motion for summary *224 judgment may not be defeated by the mere allegation that there is a dispute over a material fact; the adverse party must set forth, by affidavit or otherwise, specific facts showing that there is a genuine factual issue for trial. Rule 121(d). Respondent's motion for partial summary judgment is addressed only to Elmer South's claimed deduction for research and experimental expenditures. In support of his motion, respondent relies on certain documentary evidence and admitted allegations in the pleadings. For purposes of this motion only, he accepts the assertions contained in such documents as true. Section 174(a)(1) provides, as a general rule, that research or experimental expenditures which are paid or incurred by a taxpayer during the taxable year in connection with his trade or business may, at the election of the taxpayer, be treated as expenses not chargeable to capital account and may be, therefore, deducted in the taxable year. The expenditures to which section 174 apply may relate to a general research program or to a particular project. Sec. 1.174-1, Income Tax Regs. *225 The provisions of section 174 "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Sec. 1.174-2(a)(2), Income Tax Regs.
Prior to the Supreme Court's decision in Snow v. Commissioner,416 U.S. 500 (1974), this Court had taken the position that, in order to be deductible under the provisions of section 174(a)(1), research or experimental expenditures had to be made in connection with an existing trade or business to which such research or experimentation was proximately related, and not with a mere prospective business. Best Universal Lock Co. v. Commissioner,45 T.C. 1, 10 (1965); Koons v. Commissioner,35 T.C. 1092, 1100 (1961). Research or experimental expenditures incurred by a taxpayer not currently engaged in a trade or business to which the expenditures were proximately related were held to be nondeductible pre-operating *226 expenses. Koons v. Commissioner,35 T.C. at 1101. In Snow v. Commissioner,416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), which affirmed 58 T.C. 585 (1972), the taxpayer, an executive in a large corporation, contributed $10,000 for a 4-percent interest in Burns Investment Company, a limited partnership formed in 1966 to develop "a special purpose incinerator for the consumer and industrial markets." Trott, the general partner of the partnership, was the inventor of the incinerator and had conceived this idea in 1964. Between 1964 and 1966, Trott made and tried out a number of prototypes. In 1965, his patent counsel advised him that the incinerator as a whole had not been sufficiently "reduced to practice" in order to develop it into a marketable product. At that point Trott formed Burns, taxpayer putting up part of the capital. Trott conveyed all his rights in the invention to the partnership. During 1966, Burns had no manufacturing plant or office. No effort was made to market or sell the device in 1966. After 1966, the design of the incinerator was changed in some particulars. An application for *227 a patent was filed in 1968 and granted in 1970. Prior to 1970, Burns was incorporated and was producing and marketing the incinerator, the taxpayer being its chairman of the board of directors. The taxpayer was also a limited partner in two other limited partnerships formed by Trott, who was also their general partner, for the respective purposes of developing a telephone-answering device and an electronic tape recorder. Both partnerships had claimed deductions for research or experimental expenditures in 1965 and 1966 which were not challenged by the Commissioner, apparently because their products were in a more advanced stage of development and were available for sale or licensing. This Court held that the taxpayer was not entitled to deduct his distributive share of Burns' claimed research or experimental expenditures in 1966, since the partnership was not engaged in a trade or business and the research was not related to Burns' or the taxpayer's one trade or business. 58 T.C. at 597. The Sixth Circuit affirmed our conclusion that the partnership's expenditures were pre-operating expenses and therefore nondeductible under section 174. 482 F.2d at 1032. *228 The Supreme Court reversed and stated that section 174 was enacted to "dilute some of the conception of 'ordinary and necessary' business expenses under section 162(a)" adumbrated by Justice Frankfurter in a concurring opinion in Duputy v. duPont,308 U.S. 488 (1940) -- where he said that carrying on a trade or business, for purposes of the predecessor of section 162, "involves holding one's self out to others as engaged in the selling of goods or services." 308 U.S. at 499. The phrase "trade or business" contained in approximately 60 sections of the Code was, the Supreme Court noted, not helpful in interpreting the phrase "in connection with" in section 174(a)(1) since section 162(a) is more narrowly written than is section 174. The deduction for the taxpayer's distributive share of the research and expenditures was allowed for 1966, even though there were no sales in that year, since to do otherwise would "defeat the congressional purpose somewhat to equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market * * *." 416 U.S. at 504. Cleveland v. Commissioner,297 F.2d 169 (4th Cir. 1961), *229 was cited with approval. In Cleveland v. Commissioner,supra, the investor-taxpayer advanced monies, beginning in 1931, to an inventor for support of his family and for materials and equipment to enable him to carry on his work. The taxpayer, an attorney, provided advice to the inventor, negotiated transfers to users of the inventions, and prepared any necessary legal documents. The taxpayer made the inventor acquainted with those persons known to him who were or might be engaged in such fields of endeavor as would provide the necessary outlets for the invention. By at least 1945 the two men had orally agreed that they had equal interests in the enterprise. On April 20, 1956, a "trust" document was executed, retroactive to December 31, 1954, recording the tenor of their mutual understanding. The Fourth Circuit upheld this Court's determination that the taxpayer's advances to the inventor prior to the execution of the written agreement were loans and therefore not deductible as research and experimental expenditures under section 174. It also held that the advances, other than advances for the personal expenses of the inventor, made after the date of execution *230 of the agreement -- providing that: (1) The inventor was to devote "his full time in active experimentation on the invention;" (2) the taxpayer was to advance the expenses of experimentation of the inventor to the extent of his financial ability to do so; (3) should the invention be financially successful the taxpayer's law firm would be compensated for the legal services provided by the taxpayer; and (4) they would equally share the avails thereof -- were deductible under section 174. The Court of Appeals found that on the day of and after the execution of the agreement, the taxpayer was "engaging with the inventor in the trade or business of promoting the commercial development of the invention of which [the taxpayer] was the owner of a participating one-half interest." 297 F.2d at 173-174. This Court was again faced with the issue of the deductibility of claimed research and experimental expenditures in Green v. Commissioner,83 T.C. 667 (1984). This case involved a limited partnership, LaSala Ltd., originally formed in 1977 and reorganized and expanded in 1979 for the stated purpose of acquiring four inventions for investment and income producing *231 purposes and to thereafter patent, improve, maintain, and exploit the inventions. LaSala entered into four sets of agreements -- each set concerning one of the four inventions acquired by the partnership -- each set including: (1) An Acquisition agreement; (2) a research and development agreement; and (3) an exclusive license agreement. Each acquisition agreement was entered into between LaSala and an inventor and, by its terms, conveyed all of the inventor's right, title, and interest in his invention or inventions, including any patent rights, to the partnership. None of the four inventions acquired by LaSala was patented as of December 24, 1979. LaSala entered into four research and development agreements with NPDC, a patent development company, pursuant to the terms of which NPDC agreed to provide research and experimental services, systems analysis, and technical documentation "as are reasonably necessary and customary to develop the Product into a commercially viable, marketable product or process." NPDC further agreed to furnish LaSala with quarterly progress reports of functions performed, changes in personnel or subcontractors, and funds expended, and agreed to confer with *232 representatives of LaSala to explain such progress reports. Also on the same date, LaSala and NPDC entered into four identical exclusive license agreements pursuant to which LaSala granted NPDC the "exclusive worldwide right and license to enjoy, commercialize, manufacture, use, sell and exploit the Products." [13] The license agreements provided that the patents were to remain the exclusive property of LaSala. NPDC was obligated to make annual royalty payments to LaSala. Taxpayer-husband became a limited partner in LaSala. Taxpayers claimed a loss, representing their distributive share of the losses claimed by LaSala -- including a deduction for research and experimental expenses -- which was disallowed by the Commissioner. This Court granted the Commissioner's motion for partial summary judgment, addressed to LaSala's claimed deductions for depreciation and research or experimental expenses, and held, inter alia, that: (1) The grant by LaSala of the exclusive right to manufacture, use, and sell the inventions for the duration of the patents conveyed to NPDC all of its substantial rights in the four inventions; and (2) LaSala's expenditures under the research and development agreements *233 were not "in connection with" any trade or business as required by section 174. Respondent argues that, since Sci-Med transferred its proprietary interest and substantial rights in the results of the research and development venture to Teva, Sci-Med was precluded from ever having an active, substantial interest in the results of the research and development and from using the results in connection with any trade or business. Therefore, the argument follows, the research and experimental expenditures were not "in connection with [Sci-Med's] trade or business" within the meaning of section 174. Respondent relies on Green v. Commissioner, supra.Additionally, *234 he asserts that the claimed research or experimental expenditures were not incurred in Sci-Med's behalf because Teva was the substantive beneficiary of the research and Sci-Med had no more than bare legal title. Sci-Med's role, respondent contends, was purely that of a financing vehicle to inject capital into the venture. Petitioners argue that Sci-Med's role with regard to the research and development venture was sufficient under Snow v. Commissioner,supra, and Cleveland v. Commissioner,supra, to qualify as being "in connection with [Sci-Med's] trade or business." Petitioners argue, further, that Green v. Commissioner,supra, on which respondent relies, is an incorrect interpretation of the law and is not controlling. Alternatively, petitioners contend that, even if Green v. Commissioner,supra, represents a correct interpretation of the law, the facts herein are distinguishable from those in Green. Finally, petitioners argue that the research and experimentation carried on by Teva was carried on Sci-Med's behalf within the meaning of section 1.174-2(a)(2), Income Tax Regs. *235 We think that respondent has the better of the argument. It is clear that under Show v. Commissioner,supra, the taxpayer may not currently be engaged in carrying on a trade or business in order for research or experimental expenditures to be deductible under section 174. However, the Supreme Court, in Snow, did not, and indeed could not, delete the requirement that the expenditures be paid or incurred as a result of research or experimentation undertaken by the taxpayer, or by another person or organization in the taxpayer's behalf, "in connection with [the taxpayer's] trade or business." In Green v. Commissioner,supra, we stated that "For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time * * *." 83 T.C. at 686. This is consistent with the congressional purpose of section 174 -- "to equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market," 416 U.S. at 504. -- and does not operate to deny a deduction of research or *236 experimental expenditures to "small businesses which are developing new products and do not have established research departments." See the statement of Congressman Daniel A. Reed of New York, Chairman of the House Committee on Ways and Means, appearing at 100 Cong. Rec. 3425 (1954), quoted in Snow v. Commissioner,416 U.S. at 503. We accordingly reject petitioners' contention that Green is an incorrect interpretation of the law. The fact that the agreement between Sci-Med and Teva was styled "exclusive license agreement," is not determinative of its legal consequences. L-R Heat Treating Co. v. Commissioner,28 T.C. 894, 897 (1957); Leh v. Commissioner,27 T.C. 892, 897 (1957), affd. 260 F.2d 489 (9th Cir. 1958). Pursuant to the terms of the exclusive license agreement executed by Sci-Med and Teva, Sci-Med granted Teva the sole and exclusive worldwide license to manufacture and make sales or other dispositions throughout the world of products and to sublicense the license. The definition of products contained in the sub-research and development agreement was expressly incorporated. Thus, for purposes of *237 the exclusive license agreement, products included any inventory or patents, applied for or granted, relating to both the general research area -- the development of new antibiotic drugs, including the synthesis of new drugs, as well as the extension of any drugs currently in existence -- and the specific research area -- the rational extension of beta-lactam antibiotics. Products also included patentable and nonpatentable inventions. Sci-Med further granted Teva, under the provisions of the exclusive license agreement, the right to use the proprietary information "in its entirety." In this regard, Sci-Med was obligated to provide reasonable security measures to prevent unauthorized persons from obtaining any information, notes, records, data, plans, designs, or other documents constituting proprietary information. Sci-Med was not to divulge such knowledge; it was also not to permit any of its affiliates to perform any function or job in connection with products or to have access to the proprietary information. We agree with respondent that the so-called exclusive license agreement effected a relinquishment, for consideration, of Sci-Med's proprietary interest and substantial *238 rights in the results of the research and development venture. [14] The terms of the said agreement are clear that Teva had the exclusive right to "manufacture and make sales or other dispositions throughout the world" of products, as therein defined, for the duration of the agreement. Pursuant to the terms of the handwritten agreement, the term of the said agreement was to be the later of: (1) 24 years from December 16, 1980; or (2) 15 years from the date of commercial exploitation of the products. In no event, however, was the term of the exclusive license agreement to extend beyond the year 2019. During the aforesaid term Sci-Med was also precluded from manufacturing, selling, or distributing products which might be regarded by Teva as directly competitive. Since the exclusive license agreement was entered into by Sci-Med prior to the commencement of *239 any research or experimental activities, Sci-Med was effectively precluded from ever having a substantial right in the results of the said activities, and from ever using the results of the research or experimental activities in connection with its own trade or business, present or future. Sci-Med's role was exclusively that of a financing vehicle, injecting risk capital into the venture. Its activities never, and could have never, surpassed those of an investor. The management of investments is not a trade or business, irrespective of the extent of the investments or the amount of time required to perform the managerial functions. Higgins v. Commissioner,312 U.S. 212 (1941); Moller v. United States,721 F.2d 810 (Fed. Cir. 1983); Purvis v. Commissioner,530 F.2d 1332 (9th Cir. 1976), affg. per curiam T.C. Memo. 1974-164. A taxpayer who holds securities for long-term appreciation and who seeks current income from dividends and interest paid on such securities, rather than from frequent short-term trades, is an investor. *240 Moller v. United States,721 F.2d at 813; Purvis v. Commissioner,530 F.2d at 1334; Liang v. Commissioner,23 T.C. 1040, 1043 (1955). Sci-Med's "royalty" interest in the results of the research venture was analogous to that of an investor. Green v. Commissioner,83 T.C. at 689. Thus, there were no possibilities that Sci-Med's expenditures could be "in connection with [its] trade or business," as required by section 174. Petitioners argue that Sci-Med and Teva, the parties to the exclusive license agreement, intended that the development of the results of the research or experimentation into commercially exploitable products be a condition precedent to the effectiveness of the exclusive license agreement, and that Sci-Med did not relinquish its entire interest in the research or experimentation on the same day that it was acquired. With respect to petitioners' contention that the development of commercially exploitable products was intended to be a condition precedent to the effectiveness of the exclusive license agreement, the existence or nonexistence of such intent may be, arguably, a material issue of *241 fact requiring a trial. See Rule 121(d). As "evidence" of the existence of a factual issue regarding the intent of the parties to the license agreement, petitioners rely on: (1) Certain provisions contained in the sub-research and development agreement and in the exclusive license agreement; and (2) the affidavit of James Muskal, a patent attorney in Chicago, Illinois. Looking first to the sub-research and development and the exclusive license agreements, petitioners point to the portions of recitals which state, respectively, as follows: Whereas, the Partnership [Sci-Med] has contemporaneously entered into an exclusive license agreement and option agreement with the Developer [Teva] providing inter alia for the grant of an exclusive license to the Developer to make, manufacture, use, and sell the Products, if any, developed in the R&D [research and development] Program * * *. Whereas, the Licensor [Sci-Med] has engaged the Licensee [Teva] to conduct a research and development program (the "R&D Program") pursuant to a Sub-Research and Development Agreement executed and delivered simultaneously herewith, for the purpose of developing certain products as defined below *242 ("Products") * * *. Whereas, the Licensee desires to obtain the sole and exclusive license to make and manufacture and to use, sell and otherwise distribute Products throughout the world and in connection therwith to use the Proprietary Information, primarily by manufacturing for its own account in Israel; and Whereas, the Licensor is desirous of granting a license to the Licensee on the terms and conditions hereinafter described * * *. Petitioners further point to the terms of the sub-research and development and the exclusive license agreements which state, respectively, as follows: A. Developer [Teva] agrees during the term of this Agreement to perform such research, experimentation and development services in accordance with this Agreement and the R&D Agreement in an effort to develop Products to be sold in commercial quantities for both medical and nonmedical uses. * * * and A. Subject to the restrictions and obligations contained in the Program Agreements and as assigned in the Sub-Research and Development Agreement, the Licensor hereby grants the License to the Licensee for the consideration set forth in Paragraph 5A hereof and upon the additional terms *243 and conditions hereinafter set forth. * * * The above-quoted portions of the recitals and provisions of the aforesaid agreements are said to have a "common thread running through; that being the intent of the parties to make the conveyance under the License Agreement subject to the condition that there exist at some future time, a commercially viable product." (Emphasis added.) The sub-research and development, and the exclusive license agreements, are before us. We find these agreements to be unambiguous and indicative of the intention of the parties that they be immediately effective. This is indicated both by the agreements, considered in their totality, as well as by the fact that the date of effectiveness of both agreements commenced on the same date, December 16, 1980, the date that the agreements were signed. Even assuming, arguendo, that the totality of the operative provisions of the agreements did not clearly express the parties' intentions, we find no support for petitioners' position in the quoted portions of the recitals and of the provisions thereof. The inescapable conclusion to be derived from the reading of the above-quoted language in the sub-research *244 and development and the exclusive license agreements is that, upon the execution of the agreements, Teva received the rights to the products resulting from the research that was to be conducted by Teva. Concurrently therewith, Teva assumed the obligation to perform the research and development services agreed upon with the purpose of developing products. Since the license agreement purported to convey Sci-Med's interest in the research and development venture, a reference to the restrictions and obligations contained in the sub-research and development agreement, as well as to the research and development agreement between the OCS and Teva were necessary in order to clearly define the rights and relationships between all the parties concerned. Petitioners contend that Mr. Muskal's affidavit establishes that a "research and development partnership is one recognized and well established format within the industry for raising venture capital for development of technologies and products," and that "in order to have a complete research and development arrangement that would attract sophisticated investors, there has to be an ultimate licensee or manufacturer willing and capable of commercializing *245 the to-be-developed invention from the outset." We do not question the accuracy of Mr. Muskal's representations. However, the practices within a certain industry or field of endeavor are not determinative of the consequences of a transaction for Federal income tax purposes. In this regard, we are satisfied that section 174 as enacted by Congress and as interpreted by the Supreme Court in Snow v. Commissioner,supra, requires more than a purely passive investment. Petitioners contend that since Sci-Med retained an interest in the results of the research and development to be performed by Teva, that interest being the proprietary information, Sci-Med did not convey the whole of its interest and substantial rights in the research to Teva. We disagree. The license agreement granted Teva the exclusive right to use the proprietary information in its entirety for the term of the agreement. During the said term, Sci-Med was also to refrain from divulging such knowledge and to take affirmative security measures to prevent anyone from obtaining it. Pursuant to the terms of the option agreement, Teva was granted an irrevocable option to purchase all of Sci-Med's *246 rights, title, and interest in the proprietary information. According to the provisions of the handwritten addendum to the agreements, the irrevocable option was coterminous with the exclusive license agreement. The term of Sci-Med itself was coterminous with that of the exclusive license agreement and the irrevocable option agreement.Should Teva decide to exercise the irrevocable option to acquire the naked legal title to the proprietary information, Sci-Med would be deprived of its last remaining vestige of ownership in the research. Since during the lifetime of the option Sci-Med could not use the proprietary information, there was no foreseeable possibility that Sci-Med would ever be using the proprietary information in connection with a trade or business, present or future. The isolated sale of the proprietary information could hardly be considered to be "in connection with a trade or business". Furthermore, at the time of the expiration of the terms of both the exclusive license agreement and the option agreement, Sci-Med itself would be terminated, since their life terms were coterminous. Further, in support of their contention that Sci-Med did not convey substantially *247 all the rights in the research to Teva, petitioners argue that Sci-Med retained the right to supervise, review, and direct the work of Teva. Petitioners point to portions of the sub-research and development agreement which provide as follows: In the event that Developer's [Teva's] reports on the R&D Program indicate that the specific project described in Appendix 3 [the rational extension of beta-lactam antibiotics] may not be economically justifiable, the Developer and the General Partner of the U.S. Partnership [Yuki] shall mutually agree to amend the R&D Program so as to substitute and undertake other specific projects within the scientific research area described in Appendix 3 * * *. * * * A. The General Partner [Yuki] of the U.S. Partnership [Elmer South], solely by its duly authorized representatives, being Mr. Alex Pinsky, or Dr. Amnon Rafael, and representatives of the Government [of Israel] shall be permitted access to the premises of Developer [Teva] at which the R&D Program shall be conducted, during normal business hours, for the purposes [sic] of monitoring the progress of the R&D Program. Petitioners further point to provisions that required *248 Teva to: (1) Keep complete records of all experiments performed during all phases of the research and development program, the results thereof, and such other documentation as the Israeli Government or the OCS may require. The aforesaid items were to be available to Sci-Med for inspection during business hours on weekdays; (2) make available copies of all the documentation provided to the Israeli Government relating to the research and development to Ikapharm at Teva's premises; and (3) confer with representatives of the partners of Sci-Med to explain the technical summaries or reports required to be delivered, under the provisions of the research agreement, to the Israeli Government and to the OCS. Finally, petitioners contend that Sci-Med's activities pursuant to those rights is a material issue of fact requiring a trial. Contrary to petitioners' assertions, the aforementioned provisions did not invest Sci-Med with the power to supervise and direct Teva's work. Yuki, on behalf of Elmer South, and not Sci-Med, was, hopefully, to agree with Teva to undertake other specific projects within the scientific research area of the rational extension of beta-lactam antibiotics should Teva's *249 reports indicate that the original project was economically unfeasible. Even assuming, arguendo, that the activities of the general partner of Sci-Med's limited partner could be attributed to Sci-Med, Yuki did not acquire any supervisory or regulatory powers over Teva as a result of this provision. When and if the research and development project undertaken by Teva was found to be economically unjustifiable, Yuki and Sci-Med would be in an equal position to decide what new project to undertake. They were to "mutually agree" to amend the research and development program. The remaining portions of the sub-research and development agreement were contained in a section styled "Access to Information." Under the above-quoted provision, the representatives of Yuki, the general partner of Sci-Med's limited partner, were given access to Teva's premises in order to "monitor" the "progress" of the research and development program. Again, even assuming that Yuki's right can be attributed to Sci-Med, the said provision afforded no more than a right to check or observe the progress being made in the research. Even under the most favorable light to petitioners, this hardly equals the power to *250 control or modify Teva's work. Teva was to keep full and complete records of the experiments performed during all phases of the research and deveopment program and the results thereof and such other documentation as the Israeli Government or the OCS might reguire. In this regard, it is noteworthy that the sub-research and development agreement provided that: "the Developer [Teva] has contemporaneously herewith entered into a research and development agreement with the Government of Israel * * * to conduct the initial phase of the R&D initiated by Developer * * * and in respect thereof, report directly to the Office of the Chief Scientist of the Ministry of Industry, Trade and Tourism * * *. [Emphasis added.] The confidential memorandum prepared in connection with the offering of limited partnership units in Elmer South further stated that interim financial reports had to be furnished to the OCS. Thus, although Sci-Med was to have access to those records and documentation, this access was, as stated in the sub-research and development agreement, "for [purposes of] inspection by the Partnership [Sci-Med]." Finally, representatives of Teva were to confer with *251 representatives of the partners of Sci-Med [Ikapharm and Elmer South] in order to explain the technical summaries submitted to the Israeli Government and the OCS. This is selfexplanatory, and did not confer upon Sci-Med control over Teva's work. Petitioners contend that under Cleveland v. Commissioner,supra, they are entitled to deduct the claimed research or experimental expenditures. They claim that the oil activities of Elmer South and the research and development activity were so functionally interrelated as to be analogous to the factual situation in Cleveland.
In determining whether the research or experimental expenditures herein at issue are allowable under section 174, we look to Sci-Med. That -- as limited partner of Sci-Med, and pursuant to the provisions of Subchapter K -- there is a flowthrough of income, gains, losses, deductions, or credits of Sci-Med to Elmer South does not make Elmer South the focus of our inquiry. Finally, as our analysis of Cleveland reflects, we do not interpret the opinion of the Fourth Circuit as saying that section 174 requires nothing more than a passive role as an investor in a research or experimentation *252 venture in order to obtain a deduction under section 174. As we have discussed in extenso, supra, the management of personal investments cannot rise to the level of a trade or business, irrespective of their extent and of the amount of time devoted to them. Such a holding would seem to be in direct contravention of the statutory requirement that the expenditures be "in connection with [the taxpayer's] trade or business." Because of our determination that the research or experimental expenditures here in issue were not incurred in connection with a trade or business of Sci-Med, it is unnecessary for us to determine whether such expenditures were incurred on Sci-Med's behalf within the meaning of section 1.174-2(a)(2), Income Tax Regs. We hold that petitioners are not entitled to deduct their distributive share of partnership losses attributable to the section 174 deduction claimed in 1980, and we accordingly grant respondent's motion for partial summary judgment. An appropriate order will be issued.
Footnotes
1. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, except as otherwise noted.↩
3. Penicillin and cephalosporin-type antibiotics.↩
4. Products was defined as including: any inventory or patents (wherever applied for or granted) those related to the area being developed in the research and development program or relating to the specific project described in Appendix 3↩ [the rational extension of Beta-lactam antibiotics] pursuant to the research and development program.The products which is [sic] developed herein shall include both patentable and nonpatentable inventions. It shall not however include any inventions, technical information or other technology which is being developed in another specific area within the general area of the "development of antibiotic drugs."
5. The shekel replaced the Israeli pound as Israel's monetary unit on February 23, 1980.↩
6. Manufacture of products outside of Israel was not permitted without prior written consent of the government of Israel, represented by the OCS. ↩
7. See n. 4, supra.↩
8. Proprietary information was defined as: any and all inventions, patent applications and patents (wherever applied for or granted) trade secrets, technical information (including all blueprints, plans, drawings and specifications) and other technology relating to Products and developed in the R&D [research and development] program or related to Products and developed following completion of the R&D program and during the term of this Agreement. The Proprietary Information shall not include any technical information or other technology which is not patented or patentable by the Licensor [Sci-Med] (or the Licensee hereunder [Teva] on behalf of the Licensor [Sci-Med]) and which is described in any prior printed publication or is publicly known in the industry in which the Licensee [Teva] is engaged.↩
9. The beneficiary of this fund is not disclosed in this record.↩
10. See n. 4, supra.↩
11. See n. 8, supra.↩
12. The payments described in the said paragraph 5 of the exclusive license agreement included, inter alia, the royalty payments on net sales and license fees.↩
13. Including: (1) The right to grant sublicenses on such terms that were not violative of the provisions of the license agreement; (2) all inventions, improvements, patent applications, or patents then or thereafter owned or controlled by LaSala; and (3) the furnishing to NPDC with the necessary blueprints, working drawings, and all other data and information necessary for the manufacture of the product to the extent available or received by LaSala from the creator of the product or the developer.↩
14. Such "rights" had been acquired by Sci-Med in the same set of agreements with Teva, on December 16, 1980. Thus, if Sci-Med ever was the owner, it was for a period of time less than the flicker of an eyelid. The economic reality and substance of the whole formalism of Sci-Med as an "owner" can be seriously questioned.↩