RONALD M. BROWN and AUDREY BROWN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RONALD M. BROWN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown v. Commissioner
Docket Nos. 20014-87; 20052-87
United States Tax Court
T.C. Memo 1989-645; 1989 Tax Ct. Memo LEXIS 646; 58 T.C.M. (CCH) 850; T.C.M. (RIA) 89645; December 7, 1989
Paul J. Coselli and David C. Allie, for the petitioners. Ana G. Cummings and H. Elizabeth Downs, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Taxable Year
Deficiency
§ 6651(a)(1)
Docket No. 20052-87.
1979
$ 125,590
-
1980
198,191
-
Docket No. 20014-87.
1981
365,313
$ 91,549
1982
215,608
-
1983
286,232
-
1984
140,920
-
*649 Additions to Tax
Taxable Year
§ 6653(a) or (a)(1)
§ 6653(a)(2)
§ 6659
§ 6661
Docket No. 20052-87.
1979
$  6,280
-
-
-
1980
9,910
-
-
- Docket No. 20014-87.
1981
19,664
*   $ 49,907
-    1982
11,387 **  32,804
$ 25,566
1983
19,110 *** 44,550
34,433
1984
23,272 ****
11,336
24,830
Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect for the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure. Section 6653(a) was amended by the Economic Recovery Act of 1981, and divided into sec. 6653(a)(1) and (a)(2) applicable to taxes the last date prescribed for payments of which is after December 31, 1981. Sec. 722(b)(1), ERTA, Pub. L. 97-34, 95 Stat. 342-343. After concessions, the issues for decision are whether petitioners are entitled to *650 deduct (1) research and development expenditures in 1983 and 1984, or an abandonment loss in 1984 with respect to a greenhouse; (2) any amount attributable to the mining equipment in 1979, 1980, 1981, 1982, and 1983; (3) nonbusiness bad debts of $ 12,000 and $ 18,000 for 1981 and 1983, respectively; and (4) a long-term capital loss in 1983 as a result of their investment in Foothills. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Chehalis, Washington, at the time their petitions were filed in these consolidated cases. Hereinafter, all references to petitioner or petitioner's refer to Ronald M. Brown. In 1959, petitioner, and two other individuals, built a 60-bed nursing home in North Bend, Washington. Sometime thereafter, petitioner took over the nursing home business and, within three years, acquired three additional nursing homes. During the next 26 years petitioner and his brother expanded the business to include 26 nursing homes, located throughout California and Washington. In 1985 the nursing home business was sold. *651 Greenhouse Expenditures
In 1983, Kim Brown (Kim), petitioner's stepson, approached him with the idea of building a greenhouse for the purpose of growing above-average vine-ripened tomatoes for resale. Initially, petitioner was not receptive to the idea since neither he nor Kim knew anything about growing tomatoes, or the feasibility of the project. In order to convince petitioner of his idea, Kim introduced him to a Steve Carlson (Mr. Carlson), an agronomist. After Mr. Carlson agreed to act as a consultant, petitioner agreed to allow Kim to go ahead with the project. On November, 4, 1983, petitioner, Kim, and Mr. Carlson entered into a written agreement whereby, for $ 4,000 semi-annually, Mr. Carlson would act as consultant for the development of the soils, fertilizer program, tissue culture sampling, and advice on the growing of vegetables in the greenhouse. To determine the most cost effective and best method of growing the vegetables, Kim and Mr. Carlson spent two weeks visiting various greenhouses in California. Kim also contacted various universities and extension services requesting information on various procedures for growing vegetables in greenhouses. Prior *652 to 1983, Kim had no education or experience in growing vegetables. He had only completed two years of college when he left and was hired by a landscaping firm to do yard work. Sometime thereafter, Kim purchased a retail house plant store and for one and one-half years tried, to no avail, to make the business successful. In 1975, he obtained employment with an industrial hard chrome company where he remained employed until 1980. From 1980 until 1982, when petitioner hired Kim to do yard work for him, Kim remained unemployed and was totally supported by petitioner. Sometime in 1983, petitioner purchased approximately 18.5 acres of land in Chehalis, Washington. He planned to build a house on approximately 2.5 acres and allow Kim to use the remaining acreage for the greenhouse project. Petitioner hired George and Brodie Heck, contractors, to build the house. In August 1983, the building permit was issued and construction began. Kim also helped out with the construction of the house, which he would later live in. Meanwhile, after Kim and Mr. Carlson worked out all the logistics of the greenhouse project, Kim designed the greenhouse to be built on the remaining acreage. The *653 building permit was issued in January 1984, and construction was completed in late January 1984. Ron Flock was hired to help build the greenhouse and Brodie Heck oversaw its construction by verifying that the structure was built to withstand wind and snow. Kim also helped with its construction. No vegetables were grown before the greenhouse was completed. Beginning on January 24, 1984, petitioner paid Kim $ 1,750 per month in "salary." Petitioner capitalized the first payment and scheduled it as 15-year property. Kim received additional "salary" payments of $ 1,750 from March through July 1984, all of which petitioner claimed as deductible research and development expenditures on his 1984 Federal income tax return. Petitioner expended approximately $ 104,969.23 and $ 77,438.58 in 1983 and 1984, respectively, for building materials, building fees, equipment, utility services, and salary. Sometime between February and April of 1984, Kim and Mr. Carlson seeded their first crop of tomatoes. However, due to bacteria in the water the whole crop was lost. Kim installed a chlorinator and an iron removal system on the well to alleviate any further problems with bacteria. Thereafter, *654 another crop of tomatoes was seeded. However, in May 1984, 100 percent of the crop was again lost, this time due to ethylene poisoning emitted from the propane heaters. In order to remedy that problem electric heaters were installed in place of the propane heaters. Again, Kim seeded a new crop of tomatoes and by mid-June or July, the plants were producing and the tomatoes were ready for marketing. Kim and his wife began marketing the tomatoes by giving samples to various local grocery stores in Chehalis and Centralia, Washington. Kim was so encouraged with the response that he contacted Rocco Maggio (Mr. Maggio), a production manager of Safeway Stores in Seattle, and took some tomatoes, peppers, and eggplants to him. After seeing the produce, Mr. Maggio offered Kim 78 cents per pound of tomatoes that he could produce each year between the months of September and May. After Mr. Maggio's offer, Kim put pen to paper and determined that the activity would generate a decent return within five years if (1) a minimum of four greenhouses were built, (2) only two individuals were paid to service the greenhouses, and (3) no crops were lost during the five year period. In October Kim *655 presented the profit/cost analysis to petitioner. Petitioner's response was "no way." Hoping to recoup some of his expenses, petitioner instructed Kim to sell everything that was not going to be needed anytime in the future. Thereafter, Kim burned all the plants and closed up the greenhouse. From January 1984 until October 1984, Kim had spent all his time working on the project. Petitioner, on the other hand, spent little time at the greenhouse, nor did he make any of the day-to-day decisions with respect to the project. In fact, during the winter months, petitioner was away, vacationing in Palm Springs, California. Petitioner also failed to keep adequate records with respect to the project. In 1983 and 1984 petitioner made in excess of $ 400,000 and $ 250,000, respectively, from the nursing home business and claimed Schedule C deductions of $ 63,530 and $ 65,141, respectively, as "Research and Development/Greenhouse Products." Respondent disallowed all deductions taken with respect to the greenhouse project in 1983 and 1984. The 1983 deductions consisted of $ 53,726 research and development expenditures and $ 9,804 of depreciation expense. Petitioners substantiated $ *656 49,344.23 of the claimed expenditures and conceded the remaining $ 4,382. The 1984 deductions consisted of $ 45,984 research and development expenditures and $ 17,355 of depreciation expense. Petitioners substantiated $ 44,786.73 of the claimed expenditures and conceded the remaining $ 1,198.00. Respondent does not concede that any portion of the substantiated expenditures for 1983 or 1984 are properly characterized or deductible by petitioners. Mining Equipment
In 1979, petitioner acquired interests in various mining ventures in Nevada, and later expanded his mining interests to include the Battle Mountain, Nevada, area. In Battle Mountain, petitioner and James E. Boyle, Jr., a business associate of petitioner, put together Nevada Barite Company, a small mining venture. They planned to later acquire an existing mining operation known as Edgar Morgan Mining Company (EMMC), owned and operated by Jim Edgar (Mr. Edgar) and Tom Morgan (Mr. Morgan), once EMMC became profitable. EMMC, however, was not in a financial position to purchase the necessary mining equipment needed in order for it to pursue its venture. Therefore, petitioner planned to lease some equipment and allow *657 EMMC to use it free of charge. Pursuant to the plan, petitioner and Federal Capital Corporation (Federal) of Seattle, Washington, entered into an agreement whereby petitioner leased (1) a Fiat-Allis Dozer, Model 21B; (2) a Fiat-Allis Loader, Model 645B; (3) a Rockmaster Air Trac, Model CE100; and (4) a Radial Air Compressor, Model DR600. The 42-month lease required a $ 7,000 deposit and $ 6,621.50 per month. As security for the lease payments petitioner pledged 286,589 shares of his Centennial Villa Stock, valued at between $ 350,000 and $ 400,000, and a life insurance policy. The contract value of the leased equipment was $ 205,000. The agreement was signed on August 28, 1978, by petitioner and Arthur H. Mazzola, President. On August 30, 1979, Imperial Minerals & Machinery (seller) and Federal (buyer) executed four bills of sale for the same equipment petitioner was currently leasing from Federal. Federal paid $ 123,000 for the 21B, $ 18,500 for the CE100, $ 93,000 for the 645B, and $ 16,000 for the DR600. Petitioner's signature appears of the bills of sale as a witness to the sale. All four pieces petitioner leased were subsequently delivered to EMMC sometime in 1979. *658 Although Mr. Edgar and Mr. Morgan had ultimate responsibility for the equipment, Mr. Boyle knew where the equipment was during all times it was actually used in the mining operations. Sometime in late 1979 or 1980, Nevada Barite acquired EMMC and sometime between 1980 and 1982, American Chemical and Energy Corporation (American), of which petitioner was chairman and a shareholder, acquired Nevada Barite. In early 1980, the 645B loader was removed from the mining operations and turned over to Southwest Kenworth, an equipment dealer in Reno, Nevada. In early 1981, the 21B dozer broke down and was also turned over to Southwest Kenworth. On July 29, 1982, Mr. Boyle received a telephone call from a Florence Johnson, a caretaker of a ranch petitioner and Mr. Boyle were involved in, who informed him that a Lou Inman, a trucker, had received a court order and had, thereafter, picked up the CE100 Air Trac and the DR600 air compressor. Petitioner supplied financial assistance and support for the operations, although he was not actively involved in the day-to-day activities of the mining operations in Battle Mountain. Petitioner was not informed that his equipment was no longer being *659 used in the mining operations until sometime after all of it had been removed from the mining operations property. Upon hearing of their removal, and subsequent disappearance, petitioner went to Nevada to try to locate them but was unsuccessful. Petitioner did not ask anyone to help him locate the equipment, nor take any legal action to recover it. He believed it would cost more to locate the equipment than it was worth. Although the equipment was never found, the petitioner continued to make the required lease payments to Federal so that he would not forfeit the stock and insurance he had pledged. In July 1983, American went bankrupt. Petitioner claimed a $ 125,000 long-term capital loss deduction in 1983 for the American stock he acquired on April 21, 1982. Both parties stipulate that petitioner was entitled to claim such loss. Respondent concedes that petitioner made lease payments of $ 28,735.00; $ 67,431.00; $ 72,923.00; $ 69,081.00; and $ 11,541.50 in 1979 through 1983, respectively. Furthermore, the parties stipulate that the 1979 lease payments constitute a capital contribution to Nevada Barite in 1979. $ 12,000 McAlvain Debt
In 1979, petitioner and a William *660 McAlvain, from Reno, Nevada, were involved in some mining business together. On November 28, 1979, petitioner wrote a $ 12,000 check to Mr. McAlvain. One notation on the check has been marked out and is unreadable. The words inserted beneath this marked out notation read "exploration drilling/warm springs." These words appear in blue ink while the check was written in black ink. Petitioner has no knowledge as to when the alteration was made or who made it. In 1979, petitioner demanded repayment of the $ 12,000 from Mr. McAlvain. However, Mr. McAlvain refused to pay. The last time petitioner saw Mr. McAlvain was on December 14, 1981. Petitioner made no other attempts to collect the money In early 1988, three months before trial in these cases, Mr. McAlvain contacted petitioner and informed petitioner that he was in Brazil and involved in a potentially profitable venture. Petitioner made no mention of the $ 12,000 owed to him nor did he request payment thereof. Petitioner claimed a $ 12,000 short-term capital loss on his 1979 individual federal income tax return as a result of Mr. McAlvain's failure to repay. Respondent disallowed the loss deduction on the basis that petitioner *661 failed to establish that such amount represented a valid debt. $ 18,000 Boyle Debt
Petitioner and Mr. Boyle have been acquainted since 1978 and have developed a very close personal friendship through their business association. Mr. Boyle is a minerals exploration and mining engineer and geologist. Petitioner and Mr. Boyle were involved in several mining ventures together during the years 1978 through 1983. Petitioner occasionally advanced funds to Mr. Boyle for travel and business expenses, relating to their barite mining ventures in Nevada Barite and American, and for Mr. Boyle's personal needs. In the course of their relationship petitioner transferred to Mr. Boyle approximately $ 18,000 as follows: (1) $ 8,400: an amount Mr. Boyle still owed petitioner on a 1978 Eldorado that petitioner sold to him; (2) $ 5,000: an amount representing a note petitioner cosigned with Mr. Boyle; and (3) $ 2,000: an amount representing an advance made to Mr. Boyle from petitioner. The remaining $ 2,600 represents an amount petitioner advanced to Mr. Boyle while Mr. Boyle traveled on business for American. Although petitioner failed to maintain any records documenting any *662 of the above transactions, Mr. Boyle did keep some personal records substantiating them. Petitioner never directly demanded repayment nor did he discuss the accumulation of the "debt" with Mr. Boyle. However, in 1982, after Mr. Boyle was separated from his employment with American, petitioner and Mr. Boyle entered into an informal agreement whereby any future payments made by American to Mr. Boyle were to be made to Mr. Boyle and petitioner, jointly. In 1982, petitioner was chairman of American and, as such, encouraged the board of directors to recognize that the company owed Mr. Boyle about $ 43,000 in back wages. He also instructed them that any payment made to Mr. Boyle was to be drawn in both petitioner's and Mr. Boyle's names. American never made any payments to Mr. Boyle and, in July 1983, American went bankrupt. At the time of American's bankruptcy, Mr. Boyle was 60 years of age and, due to its bankruptcy, he lost all his personal assets and was, therefore, unable to repay any of the $ 18,000. In 1983, petitioner believed that he would never get his money back from Mr. Boyle and, therefore, he claimed an $ 18,000 short-term capital loss on petitioners' 1983 return. *663 Respondent disallowed the deduction on the basis that petitioner failed to substantiate the amount of the loss. Foothills Investment
Prior to 1983, petitioner was a passive investor in a real estate venture called Foothills Investors Group (Foothills). Robert L. Schrader (Mr. Schrader) was the sole owner of Investment Property Corporation that Foothills had hired in 1970 to act as its manager and trustee. As part of his duties, Mr. Schrader was to buy and sell property on behalf of Foothills. From 1970 through 1978 Mr. Schrader sold various parcels of the Foothills Group's investment property. However, in the process of selling the property, he kept the proceeds for himself. Philip Conrad, as the representative of Foothills, was made a party to a suit against Mr. Schrader and was subsequently made successor trustee for the Foothills Group. On March 23, 1983, a $ 166,656.74 judgment was entered against Mr. Schrader by the Superior Court of the State of Washington, King County, after it found that Mr. Schrader had acted criminally and fraudulently in converting properties owned by Foothills. The judgment is nondischargeable in a bankruptcy proceeding. The Schrader *664 judgment entitled all Foothills investors, including petitioner, to recover their allocable share of the proceeds. However, Mr. Conrad, as trustee, failed to take any action to enforce the judgment in 1983. Petitioner also failed to take any action to see that the judgment was enforced on his own behalf. On petitioners' 1983 federal income tax return, petitioner claimed a $ 30,425 long-term capital loss due to the alleged worthlessness of the Schrader judgment. Respondent disallowed the loss deduction on the basis that petitioner failed to show that the judgment was worthless in 1983. Petitioners have produced checks totaling $ 21,205.56 of the claimed $ 30,425, and concede that they are entitled to claim only $ 21,205.56. OPINION Greenhouse Expenditures
The first issue for our decision is whether petitioner is entitled to the section 174 deductions he claimed in 1983 and 1984 with respect to the greenhouse project. Petitioner alleges that the expenditures were made "in connection with his trade or business" and therefore, section 174 allows them to be currently deducted. Respondent submits that none of the deductions claimed are allowable since petitioner failed *665 to establish either that any of the expenditures were in fact "research or experimental expenditures," within the meaning of section 174(a)(1), or that they were made "in connection with his trade or business." Petitioner bears the burden of proving that respondent's determination was in error. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Section 174(a)(1) permits a taxpayer to treat "research or experimental expenditures paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." Sec. 174(a)(1). It further provides that for purposes of section 174, depreciation allowances, allowable under section 167, are to be treated as "expenditures." Sec. 174(c). Prior to the Supreme Court's decision in Snow v. Commissioner, 416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972), expenses incurred before the actual commencement *666 of a trade or business were disallowed as nondeductible pre-opening expenses. See Koons v. Commissioner, 35 T.C. 1092 (1961). However, in Snow, the Supreme Court, after comparing the "in connection with" language of section 174 with the "in carrying on" language of section 162, established that the taxpayer need not currently be producing or selling any product in order to obtain a deduction for research or experimental expenses. This Court held in Green v. Commissioner, 83 T.C. 667, 686 (1984), that Snow did not completely eliminate the trade or business requirement and that in order to take advantage of section 174
the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * * [Green v. Commissioner, 83 T.C. at 686-687.] *667 To be engaged in a trade or business, the taxpayer must be involved in the activity with an objective for profit. Although a reasonable expectation of profit is not required, the taxpayer must have entered into the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); see Levy v. Commissioner, 91 T.C. 838, 871 (1988). "Profit," in this context, means economic profit, exclusive of tax savings. Herrick v. Commissioner, 85 T.C. 237, 255 (1985); Beck v. Commissioner, 85 T.C. 557, 570 (1985). The existence of a profit objective is an important factor because it distinguishes between an enterprise carried on in good faith as a trade or business and an enterprise merely carried on as a hobby. See Cleveland v. Commissioner, 297 F.2d 169 (4th Cir. 1961), revg. in part and affg. in part 34 T.C. 517 (1960). Whether a taxpayer engages in the activity with the requisite profit objective is a question of fact to be determined on the basis of all the attending *668 facts and circumstances. Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Herrick v. Commissioner, 85 T.C. at 255; Dreicer v. Commissioner , 78 T.C. at 645. In making this determination, more weight must be given to the objective facts rather than to the taxpayer's own statements of intent. Thomas v. Commissioner, 84 T.C. 1244, 1267 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Beck v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs.
Petitioner contends that he entered into the greenhouse activity for profit and should, therefore, be allowed to currently deduct his expenditures. Respondent, on the other hand, submits that petitioner lacked the requisite profit objective and, therefore, is not entitled to deduct any expenditures pursuant to section 174 since the expenditures were not made "in connection with any trade or business." We agree with respondent. Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive *669 list of relevant factors which are to be considered in determining whether an activity is engaged in for profit. After careful consideration of all the facts in this case and the above factors, we conclude that petitioner's objective in entering into the greenhouse activity was not to make a profit, but rather to provide his step-son, who had a checkered employment history, with an opportunity to establish a business of his own. Petitioner's only participation in the activity was to provide Kim with the funds he needed to build and run the greenhouse. Petitioner did not get involved or show any interest in the day-to-day operations. Petitioner failed to keep business-like records, a further indication of his lack of a profit objective. Petitioner was an experienced and successful businessman. It is difficult to believe that an individual with his business experience would fail to keep adequate records of an activity from which he planned to make a profit. Moreover, petitioner's own testimony supports our conclusion that his objective in entering into the activity was to help Kim, not to make a profit for himself. Without deciding whether the expenditures constituted research *670 or experimental expenses, and based upon all the facts and circumstances, we find that none of the greenhouse expenditures made in 1983 and 1984 are deductible under section 174, since they were not made "in connection with a trade or business" of petitioner. Furthermore, section 167 is likewise not available with respect to the $ 9,804 and $ 17,355 of claimed depreciation deductions in 1983 and 1984, since petitioner failed to prove that he held the property for the production of income. Merely owning property that could potentially be used in a profit-related activity does not entitle a taxpayer to a depreciation deduction. Dvorak v. Commissioner, T.C. Memo. 1986-256; 51 T.C.M. 1259, 1262; 55 P-H Memo T.C. par. 86,256 at 86-1084. Based upon the foregoing we hold for respondent on this issue. Petitioner alternatively alleges that the greenhouse was abandoned in October 1984 and, therefore, he is entitled to an abandonment loss deduction under section 165(c)(2) for the expenses paid during 1983 and 1984. Respondent contends that petitioner *671 is not so entitled, since he has failed to prove that an abandonment loss was incurred in a trade or business or in an activity entered into for profit. We agree. Section 165(c)(2) provides that in the case of an individual, to which section 165(a) applies, the loss deduction shall be limited to "losses incurred in any transaction entered into for profit, though not connected with a trade or business." Sec. 165(c)(2). Here, we have already found that petitioner did not enter into the greenhouse activity for profit. Therefore, we hold that section 165(c)(2) is inapplicable and that petitioner is not entitled to an abandonment loss deduction in 1984 even if a true abandonment occurred. Mining Equipment
The next issue for our decision is whether petitioner is entitled to a long-term capital loss deduction attributable to the lease payments made on the mining equipment during calendar years 1979 through 1983, and if not, whether petitioner is entitled to deductions under section 167 or section 212 with respect to such payments. In order to reach our decision, we must first determine *672 the character of the lease payments. Petitioner first alleges that the lease payments should be characterized as capital contributions. Respondent contends that petitioner has failed to present any reliable evidence of the equipment's use beyond 1979 and, therefore, has failed to show that any of the post-1979 payments should be treated as capital contributions. In determining whether payments to or on behalf of a corporation are capital contributions a dominant factor is the motive or purpose of the transferor in making the payments. Betson v. Commissioner, 802 F.2d 365, 371 (9th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. Respondent conceded on brief that an allocable portion of the lease payments would constitute capital contributions if we were to accept Mr. Boyle's testimony as proof of the use of the equipment after taxable year 1979. Since we do accept Mr. Boyle's testimony as true, we find that allocable portions of the lease payments are properly characterized as capital contributions as follows: (1) of the $ 67,431.00 *673 paid in 1980 the amounts attributable to the 21B dozer, the CE100 air trac, and the DR600 air compressor are allowed as a capital contribution; (2) of the $ 72,923.00 paid in 1981, the amounts attributable to the CE100 air trac and the DR600 air compressor are a capital contribution; (3) of the $ 69,081.00 paid in 1982 the amounts attributable to the CE100 air trac and the DR600 air compressor and paid by July 29, 1982, are a capital contribution. The tax consequences flowing from the above characterization shall be taken into consideration in making the Rule 155 computations. Petitioner presented two alternative arguments on brief: first, that he is entitled to depreciation deductions under section 167, if we find that the lease payments required capitalization; and second, that, in any event, section 212 would allow him to deduct all the lease payments actually paid during the taxable years as expenses for the production of income. However, since we found that an allocable portion of the lease payments are properly characterized as capital contributions to Nevada Barite, we need only consider whether the remaining portions of the payments fall within the purview of section *674 212. Deductions are a matter of legislative grace and petitioner bears the burden of proving both his entitlement to, and the amount of, the claimed deductions. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); Rule 142(a). We find petitioner's first alternative inapplicable since he did not own the mining equipment. Furthermore, with respect to petitioner's section 212 argument, we find that he failed to carry his burden of proof. In order for petitioner to have carried his burden of proof, he had to prove that (1) the lease payments were "ordinary" expenses rather than capital expenditures, Woodward v. Commissioner, 397 U.S. 572 (1970); sec. 1.212-1(n), Income Tax Regs.; (2) they were ordinary and necessary, Welch v. Helvering, 290 U.S. 111 (1933); sec. 1.212-1(d), Income Tax Regs.; (3) they were directly connected with, or proximately resulted from, his nonbusiness income producing *675 activity, Trust of Bingham v. Commissioner, 325 U.S. 365 (1945); sec. 1.212-1(d), Income Tax Regs.; (4) they were not personal in nature, sec. 1.212-1(e), Income Tax Regs. See sec. 262; and (5) they were paid or incurred during the taxable year, sec. 212. Petitioner's only argument supporting his claim is that because he stood to benefit from his "investment in Nevada Barite Company and realize 'income' therefrom," section 212(1) permits him to deduct those lease payments as expenses for the production of income. Such a blanket assertion does not satisfy petitioner's burden of proof and, therefore, we hold that petitioner is not entitled to any section 212 deductions. [1]
$ 12,000 McAlvain and $ 18,000 Boyle Debts
The next issue for our decision is whether petitioner sustained deductible section 166(d) nonbusiness bad *676 debts of $ 12,000 and $ 18,000 in 1981 and 1983, respectively. Petitioner alleges that a valid debtor-creditor relationship existed in both instances and that the debts became totally worthless in 1981 and 1983, respectively. Respondent, on the other hand, submits that petitioner has failed to establish that valid debts existed in either case or, in the alternative, that the debts became totally worthless in the years claimed. Petitioner bears the burden of proving his entitlement to the deductions. Rule 142(a); see Crown v. Commissioner, 77 T.C. 582 (1981). To qualify for nonbusiness bad debts deductions under section 166(d)(1) the taxpayer must prove that a bona fide debt in fact existed and that the debt became worthless within the taxable year for which the deduction is claimed. Sec. 166(d) and sec. 1.166-1(c), Income Tax Regs.
For a disbursement to constitute a true loan there must have been, at the time the parties entered into the transaction, an unconditional intention on the part of the transferee to repay the money and an *677 unconditional intention on the part of the transferor to secure repayment. Haag v. Commissioner, 88 T.C. 604 (1987).
$ 12,000 McAlvain Debt
With respect to the alleged $ 12,000 debt the only proof petitioner offered substantiating the existence of the "loan" was a cancelled check made payable to Mr. McAlvain and his own testimony with respect to the circumstances surrounding the transfer. At trial petitioner could not remember whether he had written the check to Mr. McAlvain in payment of exploration drilling in Warm Springs or as a loan. A portion of petitioner's testimony was as follows: THE COURT: Well, the writing that looks like it was put underneath seems to say "exploration drilling, Warm Springs." Does that make any sense? THE WITNESS (petitioner): Yes, it does -- THE COURT: What does that mean? THE WITNESS: -- because there was drilling explorations in Warm Springs. THE COURT: Were you involved in that? THE WITNESS: Well, it sounds like a familiar note. I really don't know. THE COURT: Did you pay Mr. McAlvain to do exploration drilling in Warm Springs? THE WITNESS: Well, I think that is probably possible, that for exploration *678 of -- I think that would probably be in a gold -- no. I don't what it is on. THE COURT: Could you have paid him to buy a loader? THE WITNESS: No. The fact that a check payable to Mr. McAlvain exists does not, in and of itself, establish that the $ 12,000 was a true "loan." There are other facts which, when considered together, prevent us from finding that petitioner has established, as a matter of law, the existence of a debtor-creditor relationship, e.g., absence of a maturity date, no evidence of an obligation to repay the amount and no provision for interest or security. See Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963), affg. 209 F. Supp. 312 (D.Hawaii 1962). Under the circumstances, we are constrained to conclude that petitioner has not met his burden of proving that a true debtor-creditor relationship existed and that a true loan, in fact, was made to Mr. McAlvain. Even assuming that there was a loan, however, petitioner is not entitled to a deduction because he has not established that the debt became worthless in 1981. *679 To establish worthlessness, petitioner must show that an identifiable event or a series of events occurred during the year which effectively established that the debt became worthless. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Petitioner testified that he demanded repayment sometime in 1979 or 1981 and that Mr. McAlvain refused to repay the $ 12,000. However, a mere demand of payment with no payment resulting is not a sufficient event to claim worthlessness. Poletti v. Commissioner, T.C. Memo. 1966-47. Petitioner made no further attempts to collect the $ 12,000 after this time. Moreover, Mr. McAlvain telephoned petitioner in 1988, three months before this trial, saying that he had "made it big." Petitioner, however, made no demand for repayment. Based upon the foregoing, we find petitioner has failed to carry his burden of proving his entitlement to a section 166(d) deduction for 1981. $ 18,000 Boyle Debt
With respect to the "loan" to Mr. Boyle, petitioner points to the fact that Mr. Boyle maintained a diary of the amounts owed to petitioner, acknowledged his obligation to *680 petitioner in a financial statement provided to the Reno Office of the Internal Revenue Service, and agreed to have petitioner be a joint payee of any monies received from American. Respondent contends that there is no evidence that the parties intended to create a bona fide debt when the advances were made and, therefore, no deduction is permitted. At trial, Mr. Boyle testified that petitioner had lent him approximately $ 18,000. In support thereof, Mr. Boyle produced and relied upon written memoranda that he had made during the time petitioner lent him the money. We believe Mr. Boyle and find $ 15,400 of the $ 18,000 claimed to be a bona fide debt. We conclude, based upon Mr. Boyle's testimony, that $ 2,600 represents advances made without any intent of repaying and is, therefore, not a true loan and not deductible. We must next determine whether the $ 15,400 loan became worthless in 1983. We consider such factors as the debtor's age, health, earning capacity, educational status, and income potential. See Yara Engineering Corp. v. Commissioner, 344 F.2d 113 (3d Cir. 1965), *681 affg. per curiam a Memorandum Opinion of this Court. In 1983 Mr. Boyle was 60 years of age, had no assets from which the debt could be repaid, had no realistic means of repaying the debt, and, to this day, has no realistic means of repaying it. Although mere proof of a debtor's financial difficulties will not alone sustain a bad debt deduction, we believe that Mr. Boyle had no reasonable means of repaying petitioner in 1983, especially after American went bankrupt. See Clemens v. Commissioner, 453 F.2d 869 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court. Furthermore, although petitioner never formally demanded repayment of the loan, the evidence clearly indicates that his reason for not making such demand was that he knew that Mr. Boyle was not in a position to make payment at that time. There was a reasonable prospect of repayment at least in 1982, since they both believed that American would, at some point, pay approximately $ 43,000 to Mr. Boyle. Based upon that belief, petitioner and Mr. Boyle entered into an agreement whereby any payment made by American to Mr. Boyle would be drawn in both petitioner's and Mr. Boyle's names. To effectuate *682 this agreement, petitioner requested American's board to make all checks otherwise payable to Mr. Boyle, payable to them jointly. However, by the time American went bankrupt in 1983, and no payments had been made by American to Mr. Boyle, all reasonable prospects of petitioner's receiving repayment ended. Based upon the foregoing, we find that the $ 15,400 loan became totally worthless in 1983. Foothills Investments
The next issue for decision is whether petitioner is entitled to a $ 21,205.56 section 165(a) loss deduction in 1983. Petitioners allege that the Schrader judgment became worthless in 1983 since Mr. Schrader was sentenced to jail, making collection of the judgment remote. Respondent contends that petitioner is not entitled to the deduction, since he has failed to produce any evidence from which it can be reasonably concluded that the judgment was unenforceable and, therefore, worthless in 1983. Section 165(a) provides that "there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance." In the case of an *683 individual section 165(c) limits the deductions to losses incurred in a trade or business or in a transaction entered into for profit, or losses arising from casualty or theft. Sec. 165(c)(1), (c)(2) and (c)(3). Furthermore, to be allowable as a deduction, the loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs.
If in the year the event occurs there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss, with respect to which reimbursement may be received, is "sustained" for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Sec. 1.165- 1(d)(2)(i), Income Tax Regs. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss requires an objective inquiry into the facts and circumstances surrounding the loss as of the close of the taxable year for which the deduction is claimed. Dawn v. Commissioner, 675 F.2d 1077 (9th Cir. 1982); *684 sec. 1.165-(d)(2)(i), Income Tax Regs.
Petitioner made no showing that Mr. Schrader was insolvent at the time the judgment was entered or at any time thereafter. Nor did he introduce any evidence that any collection remedies were unsuccessfully pursued during that year. The burden was on petitioner to show that, in 1983, his prospect of recovering $ 21,205.56 or any part thereof was no longer reasonable. See Hudock v. Commissioner, 65 T.C. 351, 361 (1975) and Rule 142(a). On the basis of the record before us, we find petitioner has failed to carry his burden and, accordingly, respondent's determination on this issue is sustained. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on $ 364,364 ** 50 percent of the interest due on $ 213,701 *** 50 percent of the interest due on $ 268,702 **** 50 percent of the interest due on $ 140,855↩
1. Petitioner has not argued, and we therefore do not decide, whether the portion of the lease payments not found to be capital contributions to Nevada Barite would otherwise be characterized as capital expenditures which would increase the basis in his Centennial Villa Stock.↩