ROBERT E. AND SHARON D. KANTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kantor v. Commissioner
Docket Nos. 30593-85, 16835-86
United States Tax Court
T.C. Memo 1990-380; 1990 Tax Ct. Memo LEXIS 398; 60 T.C.M. (CCH) 225; T.C.M. (RIA) 90380; July 24, 1990, Filed *398 Decisions will be entered under Rule 155. David L. Gibson, for the petitioners. Andrew D. Weiss, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2) [1]
1981
$ 3,497
$ 174.00
*
1982 2,111
105.55
*
In the notice of deficiency concerning 1981, respondent determined that the underpayment of tax was a substantial underpayment attributable to a tax motivated transaction and that therefore petitioners were liable for increased interest under section 6621(d) (redesignated and herein referred to as section 6621(c)). In his answer, respondent claimed the section 6621(c) increased rate of interest for 1982. After concessions, the issues for decision are: (1) whether PCS, Ltd., an Arizona limited partnership, was engaged in a trade or *399 business so that petitioners, limited partners of PCS, Ltd., may deduct their distributive share of partnership losses resulting from expenditures incurred by PCS, Ltd. in 1981 and 1982 for research and development; (2) whether petitioners are liable for additions to tax for negligence under sections 6653(a)(1) and (2); and (3) whether petitioners are liable for increased interest under section 6621(c). (In his opening brief, respondent for the first time raised an issue concerning the partnership's use of a note due in 1986, which respondent claims contains a contingency, in payment of research and development expenses. Since we find that the research and development expenditures incurred by PCS, Ltd. were not incurred in connection with a trade or business of PCS, Ltd., we need not address this newly raised issue.) FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Mountain View, California, at the time they filed their petitions. While working for Data Technical Analysts, Inc. (DTA), Sushil Garg devised a computer language *400 known as PRO-IV. PRO-IV is primarily a business application computer language, touted to be faster and better than, and thus designed to replace, the COBOL computer language. Edwin G. Hubert (Hubert) first learned of PRO-IV in 1980 from Merle Amundson (Amundson), Calvin Lee (Lee) and David Scott. Prior to that time, Hubert had gained considerable experience in the computer field. He had been a systems engineer with IBM for eight years and upon leaving IBM entered into the computer consulting and leasing businesses. Hubert informed Ernie Huber (Huber) about PRO-IV. (Hubert believed Huber to be the most knowledgeable software person he had ever met.) Together, Hubert and Huber arranged to test PRO-IV at the offices of General Automation Corporation (General Automation), one of DTA's five licensees for PRO-IV. Although Hubert and Huber were somewhat skeptical of PRO-IV's touted capabilities, they recognized that if it performed as claimed, it would be a technological breakthrough in the software industry. After 16 hours of successful testing at General Automation, Hubert decided to acquire a license for the PRO-IV program. Thereafter, he and Huber met with Amundson and Lee to discuss *401 obtaining a license from sfrm DTA for further development of PRO-IV. (PRO-IV had been designed for use on computers manufactured by General Automation. Hubert wished to convert the PRO-IV to run on computers manufactured by Digital Equipment Corporation (DEC), IBM, and Zilog.) Lee informed Hubert and Huber that DTA already had five licensees and that no further licenses were going to be granted. Undaunted by this rejection, Hubert contacted Lee two weeks after the meeting concerning the procurement of a PRO-IV license. Thereafter, Amundson informed Hubert that DTA had granted Amundson and Lee a license for PRO-IV, and that Hubert could also be granted a license. The license was for conversion of PRO-IV to run on DEC computers. Hubert formed two limited partnerships, PRO-IV, Ltd. and PRO-81, Ltd., to fund the necessary research and development. Amundson and Lee formed PRO-IV, Inc. to perform the development work on behalf of the limited partnerships. In February 1981, it was determined that PRO-IV could be converted for use on DEC computers. Armed with this success, Hubert next aspired to convert PRO-IV to run on IBM computers and, as of May 1981, he had planned to form another *402 limited partnership to fund the necessary research even though no license for such conversion was available. Prior to that time, Amundson had successfully negotiated a second PRO-IV license from DTA. In November 1980, DTA and Computer Ventures, Inc. (CVI), a corporation owned by Amundson, entered into a software agreement whereby CVI was granted a license by DTA to convert PRO-IV to run on Zilog computers. CVI subsequently assigned its rights under the software agreement to Pro Computer Sciences, Inc. (PCS, Inc.), another corporation owned by Amundson. (The software agreement specified Zilog computers rather than IBM computers because DTA, at that point in time, was unwilling to grant licenses for development on IBM hardware. ) Hubert, as a general partner, formed PCS, Ltd., an Arizona limited partnership, to fund the conversion of PRO-IV to run on Zilog computers. (Hubert, nevertheless, remained hopeful that an IBM conversion could be developed. In October 1981, DTA granted PCS, Inc. a nonexclusive license for IBM equipment, and in December 1981, this license was made exclusive except as to IBM personal computers.) On December 30, 1981, PCS, Ltd. and PCS, Inc. entered into a *403 research and development agreement (R & D Agreement) and a technology transfer agreement (Technology Transfer Agreement). Under the R & D Agreement, PCS, Inc. agreed to perform the research and development, on behalf of PCS, Ltd., necessary to convert PRO-IV to run on IBM computers. The R & D Agreement specified that the results of PCS, Inc.'s development, i.e., Technology and Items of Technology as defined in the R & D Agreement, would be the exclusive property of PCS, Ltd. Quarterly status reports were to be provided to PCS, Ltd. by PCS, Inc. PCS, Inc. had the right to determine when an Item of Technology had been developed; however, the criteria to be applied by PCS, Inc. in making this evaluation was subject to approval by PCS, Ltd. For its efforts, PCS, Inc. was to receive from PCS, Ltd. a total of $ 3,150,000, payable as follows: (a) $ 563,000 upon execution of the R & D Agreement; (b) $ 837,000 evidenced by a promissory note payable on June 1, 1982; and (c) $ 1,750,000 evidenced by a promissory note payable on December 31, 1986. Under the Technology Transfer Agreement, PCS, Inc. was granted the right to a thirteen month review period (the review license) to determine whether *404 it wanted to market any Items of Technology which had been developed. In conjunction with the review license, PCS, Inc. was given an option to acquire an exclusive and worldwide license to exploit the Items of Technology selected for review. The exercise price of the option was $ 5,000. If the option was exercised by PCS, Inc., PCS, Ltd. was entitled to receive royalties. Hubert was actively involved in the PRO-IV-IBM conversion. He personally prepared and negotiated the R & D Agreement and the Technology Transfer Agreement. He drafted PCS, Ltd.'s offering memorandum and partnership agreement, and he reviewed the status reports furnished pursuant to the R & D Agreement. Because of his technical expertise, Hubert communicated with PCS, Inc.'s computer programmers. (Hubert became a member of PCS, Inc.'s board of directors but did not acquire stock in PCS, Inc.) Through contacts developed over the years in the computer industry, he arranged for a beta test site for the IBM conversion. (A beta test is a test of the developed software by a customer of the developer.) During 1983 and 1984, PCS, Inc. needed additional financing to complete development of the IBM conversion. It was able *405 to obtain such financing from a foreign investor. In connection with the financing, new license agreements were entered into and the Technology Transfer Agreement was canceled. In the Fall of 1984, PCS, Inc. completed its research and development of the PRO-IV-IBM conversion. In February 1985, PCS, Ltd. granted licenses to various entities to market the PRO-IV-IBM conversion. In 1987, McDonnell Douglas Corporation purchased all rights related to the PRO-IV language, including PCS, Ltd.'s rights to the IBM conversion. Petitioners were informed of the opportunity to invest in PCS, Ltd. by their investment advisor. On December 4, 1981, they acquired one-half of a unit in PCS, Ltd. (35 units were sold; petitioners' interest in PCS, Ltd. was approximately 1.4 percent) for $ 50,000, paying $ 12,500 in cash and executing an interest bearing promissory note for the balance. PCS, Ltd.'s private placement memorandum provided that in the event PCS, Inc. did not exercise its option to acquire an exclusive license, PCS, Ltd. would not have sufficient capital to license any developed technology. PCS, Ltd. sustained losses in 1981 and 1982; petitioners deducted their distributive share of such *406 losses ($ 12,500 for 1981 and $ 23,162 for 1982) on their tax returns. PCS, Ltd.'s losses were primarily attributable to expenditures incurred for research and development. The partnership loss deductions claimed by petitioners were disallowed by respondent. [2] OPINION 1. Research and Experimental Expenses
Section 174(a)(1) provides, as a general rule, that a taxpayer may elect to "treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." Expenditures so treated are deductible in the taxable year in which paid or incurred. *407 Section 1.174-2(a)(2), Income Tax Regs., provides that the provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Respondent contends that PCS, Ltd. was prohibited both contractually and by design from conducting any regular and substantial activities in connection with the development of the PRO-IV language. He argues that PCS, Ltd.'s research and experimental expenses were not paid or incurred in connection with PCS, Ltd.'s trade or business within the meaning of section 174; thus, petitioners are not entitled to the claimed loss deductions. Petitioners, on the other hand, contend that PCS, Ltd., through the continuous and regular activities of its general partner, Hubert, was engaged in a trade or business. We agree with respondent. In Snow v. Commissioner, 416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972), the Supreme Court considered *408 section 174 in the context of the disallowance of a deduction of a partner's pro rata share of losses by a partnership organized to conduct research and development where the partnership had at the time made no sales. In allowing the loss deduction, the Court stated that the use of the phrase "in connection with * * * [a taxpayer's] trade or business" for purposes of section 174 was intended to be broader than allowing "ordinary and necessary" business expenses for purposes of section 162(a) and other Code sections. The Court stated that limiting a trade or business test under section 174 which depended on the existence of production or sales of the invention "would defeat the congressional purpose somewhat to equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market." 416 U.S. at 504. In Green v. Commissioner, 83 T.C. 667 (1984), we held that the partnership in which the taxpayer had invested could not have been engaged in a trade or business since it had disposed of all the incidents of ownership in the inventions to be developed by assigning all its rights in the inventions to a third party. (Following this assignment, the partnership's *409 activities were purely ministerial and the taxpayers were merely investors.) We said that in order to deduct expenses under section 174: the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business * * *. [Green v. Commissioner, supra at 686-687.Fn. refs. and citations omitted.]
Thus, we disallowed the section 174 deduction for the partnership's research and development fee, characterizing the partnership as merely an "investor" in the business activities of the research contractor. After our opinion in Green, we held in Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987), that the grant of an exclusive license foreclosed the possibility that the licensor could be engaged in a trade or business in connection with the licensed product because the licensor was deprived of control over the manufacture, use, and sale of the product. Levin v. Commissioner, supra at 726-727. In Diamond v. Commissioner, 92 T.C. 423 (1989), on appeal (4th *410 Cir., October 16, 1989), we disallowed the taxpayers' claimed entitlement to their distributive share of a partnership's section 174 deduction. We therein adopted the reasoning of the Seventh Circuit in Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. a Memorandum Opinion of this Court. In Spellman, the taxpayer was a limited partner in Elmer South Oil Partnership, which in turn was a limited partner in Sci-Med, whose general partner was an Israeli corporation. The agreement creating Sci-Med provided that Sci-Med would enter into a research and development agreement with Teva Pharmaceutical Industries (Teva), an Israeli drug manufacturer and the parent of Sci-Med's general partner. Sci-Med agreed to contribute $ 855,000 to enable Teva to develop new antibiotics. Teva was to have the exclusive right to market the antbiotics developed as part of the specific project, and Sci-Med was to become the owner of any by-products developed under the agreement which were not developed as part of that project. Teva was given the exclusive right to use those by-products in connection with the exploitation of the antibiotics developed as part of the project, and was given the further *411 option to purchase the remainder of Sci-Med's rights in these by-products for $ 20,000. Citing Green, we held that the exclusive license agreement "effected a relinquishment * * * of Sci-Med's proprietary interest and substantial rights in the results of the research and development venture." Spellman v. Commissioner, T.C. Memo. 1986-403, 52 T.C.M. 298, 306-307, 55 P-H Memo T.C. par. 86,403 at 1824 (1986).
The Seventh Circuit affirmed our Memorandum Opinion, not on the basis of the exclusive license agreement, but rather because of the substance of Teva's option to purchase the by-products of the research. The Court of Appeals posed a hypothetical situation in which Sci-Med financed Teva's research and development in exchange for a royalty interest and concluded that such financing would be a capital contribution and hence not deductible. The Court of Appeals stated: The only difference between the hypothetical case and our case is that Sci-Med had a prospect of recovering not only royalties but also byproducts, and if that happened and it decided to develop the byproducts rather than sell or license their development to another firm like Teva, it would be in the pharmaceutical *412 business. But this prospect was remote, and not only because Sci-Med presented no evidence that it has, or is likely ever to acquire, a staff, relevant experience, or anything else indicating a likelihood or intention of entering the business. Whatever Sci-Med's desires, Teva's option to acquire for only $ 20,000 all rights in the byproducts will prevent Sci-Med as a practical matter from ever entering the pharmaceutical business as a result of the venture with Teva. If the byproducts turn out to be worth more than $ 20,000, Teva will exercise the option and Sci-Med will have no products to make or sell; if the byproducts turn out to be worth less, Sci-Med will have the right to market them but will not exercise the right because the costs would exceed the possible profits. * * * [Spellman v. Commissioner, 845 F.2d 148, 150-151 (7th Cir. 1988).]
In Diamond, the taxpayer argued that the operative agreements established an option to acquire a license, as opposed to an exclusive license, and therefore the partnership's research and development expenditures should not be disallowed under the rationale of Levin. In adopting the reasoning of the Seventh Circuit in Spellman, we found *413 it unnecessary to decide whether the operative agreements created an exclusive license subject to Levin or an option to acquire a license. Diamond v. Commissioner, supra.
Here, PCS, Ltd. granted PCS, Inc. an option to acquire an exclusive license. The economic analysis in Spellman, which we adopted in Diamond, is dispositive of the matter in this case. See also Coleman v. Commissioner, T.C. Memo. 1990-357.Although we believe PCS, Ltd., through Hubert, had the expertise and contacts necessary to license items of technology in the event PCS, Inc. failed to exercise its option in the Technology Transfer Agreement, in our opinion there was no realistic prospect that items of technology would ever be exploited in any trade or business carried on by anyone other than PCS, Inc. at the beginning of the transaction. [3] *414 This precise point was recognized in PCS, Ltd.'s private placement memorandum which stated that in the event PCS, Inc. does not exercise its option to license the technology, PCS, Ltd. does not and will not have sufficient capital to directly license the technology to users. [4]
Petitioners point to the fact that Hubert had formed an Arizona corporation to take over PCS, Inc.'s development efforts in the event of its breach of the R & D Agreement. Despite Hubert's expertise, which we acknowledge, we are not persuaded that the formation of this corporation established the necessary infrastructure to undertake the research and development work. Diamond v. Commissioner, supra.
Accordingly, respondent's *415 determination with respect to this issue is sustained. 2. Sections 6653(a)(1) and 6653(a)(2) Additions
We next consider whether petitioners are liable for additions to tax for negligence pursuant to sections 6653(a)(1) and 6653(a)(2). Section 6653(a)(1) provides for an addition to tax in an amount equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest payable under section 6601 with respect to that portion of an underpayment attributable to negligence or intentional disregard of rules and regulations. Petitioners have the burden of proving that the underpayment of tax was not due to their negligence or intentional disregard of rules and regulations. Bixby v. Commissioner, 58 T.C. 757 (1972); Enoch v. Commissioner, 57 T.C. 781 (1972). Negligence is defined as the lack of due care or failure to do what an ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).Petitioners contend that they relied upon their tax return preparer and thus are not liable *416 for the additions under sections 6653(a)(1) and (2). Petitioners presented the testimony of their investment advisor who stated that petitioners made their own investment decisions. Petitioners neither presented the testimony of their tax return preparer nor testified themselves on this question. Petitioners failed to establish their reliance on the tax return preparer or that the underpayment of tax was not due to their negligence or intentional disregard of rules and regulations. Accordingly, we sustain respondent's determination on this issue and hold that petitioners are liable for the additions to tax under sections 6653(a)(1) and 6653(a)(2). 3. Section 6621(c) Interest
We have disallowed petitioners' deductions under section 174 because the claimed expenses were not incurred in any trade or business of PCS, Ltd. Since this ground is neither enumerated in section 6621(c) nor discussed in the regulations promulgated thereunder, petitioners are not liable for additional interest under section 6621(c). See Harris v. Commissioner, T.C. Memo. 1990-80. To reflect the foregoing and concessions made by the parties, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code cif 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the determined deficiency.↩
2. Although respondent disallowed the entire amount of petitioners' claimed partnership losses, petitioners' distributive share of partnership losses included partnership expenses in addition to the claimed research and development expenditures. Since respondent has only challenged petitioners' entitlement to deductions under section 174, respondent is deemed to have conceded petitioners' entitlement to deduct that portion of their distributive share of the loss resulting from other than section 174↩ expenses. See Rule 151(e).
3. Since our conclusion is based upon facts that existed at the beginning of the transaction, we find it unnecessary to address what effect, if any, the subsequent license agreements and cancellation of the Technology Transfer Agreement had upon the relationship between PCS, Ltd. and PCS, Inc. Moreover, "Even a firm that has surrendered by contract all rights to the product * * * may renegotiate the contract; in this sense every investor has the 'potential' to be a manufacturer. " Levin v. Commissioner, 832 F.2d 403, 406 (7th Cir. 1987), affg. 87 T.C. 698↩ (1986).
4. We also question the ability of PCS, Ltd. to exploit the items of technology in the event PCS, Inc. failed to exercise its option. PCS, Inc. had the exclusive license to PRO-IV from DTA and under the software agreement, PCS, Inc. was prohibited from transferring any of the developed technology to PCS, Ltd.↩